**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DESPINA ASVESTA,
            *Petitioner-Appellee,*

v.

GEORGE PETROUTSAS,
            *Respondent-Appellant.*

No. 08-15365

D.C. No.
5:07-cv-05535-JF

OPINION

Appeal from the United States District Court
for the Northern District of California
Jeremy D. Fogel, District Judge, Presiding

Argued Submitted July 14, 2008
Submitted August 28, 2009
San Francisco, California

Filed September 4, 2009

Before: Procter Hug, Jr., Richard A. Paez, and
Marsha S. Berzon, Circuit Judges.

Opinion by Judge Paez

## COUNSEL

Carmenella Athena Roussos, Elk Grove, California, for the respondent-appellant.

Renee C. Day, Hoover & Bechtel, LLP, San Jose, California; Stephen J. Cullen and Kelly A. Powers, Miles & Stockbridge P.C., Towson, Maryland, for the petitioner-appellee.

## OPINION

PAEZ, Circuit Judge:

For four years, the minor child ("the child") of George Petroutsas, a dual citizen of Greece and the United States, and Despina Asvesta, a Greek citizen, has been situated squarely at the center of his parents' tumultuous separation and divorce, an event that has involved the courts of both the United States and Greece. Twice the child has been spirited from continent to continent—first by the mother, who kept the child in Greece, away from the father in the United States, after originally traveling there for a brief visit, and then by the father, who secreted the child back to the United States during a court-ordered supervised visit. Both parents have filed petitions under the Hague Convention on the Civil Aspects of International Child Abduction, an international agreement governing the return of children removed, usually by one parent in order to gain a custody advantage over the other parent, from their "habitual residence."

A Greek court denied the first petition, filed by the father after the mother traveled with the child from the United States to Greece and kept the child there, determining that it was not bound to return the child to the United States. After the father took the child from Greece and returned to the United States, the mother filed a Hague petition in the district court in this case, seeking return of the child to Greece. The district court granted the mother's petition on the basis of comity, or deference, to the Greek court's denial of Petroutsas' Hague petition.[1]

---

[1]The district court stayed enforcement of the judgment pending appeal.

On appeal, we must determine whether the district court properly extended comity to the Greek court's Hague order. We conclude that it did not, reverse the district court's order, and remand for further proceedings.

## I.   The Hague Convention

The Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11,670, 1343 U.N.T.S. 49 (the "Hague Convention" or the "Convention"), was adopted in 1980 by the Fourteenth Session of the Hague Conference on Private International Law. The Convention's goal is "to secure the prompt return of children wrongfully removed to or retained in any Contracting State; and . . . to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." Hague Convention, art. 1. Both the United States and Greece are signatories to the Convention. U.S. Department of State, Bureau of Consular Affairs, Hague Abduction Convention Country List, http://travel.state.gov/ family/ abduction/hague_issues/ hague_issues_1487.html (last visited Aug. 5, 2009). The United States implemented the Convention through the enactment of the International Child Abduction Remedies Act (ICARA), 100 Pub. L. No. 300; 102 Stat. 437 (1988) (codified as amended at 42 U.S.C. § 11601 *et seq*).

In drafting the Convention's provisions, the Conference attempted to address a particular type of "kidnapping" scenario: one in which a person, usually a parent, removes a child to, or retains a child in, a country that is not the child's habitual residence in order "to obtain a right of custody from the authorities of the country to which the child has been taken." Elisa Pérez-Vera, *Hague Conference on Private International Law* 428-29, ¶ 13 (1982) (hereinafter, *"Pérez-Vera Report"*).[2] The Convention seeks to eliminate the motivation

---

[2]The explanatory report of Elisa Pérez-Vera, the official Hague Conference reporter, is "recognized by the Conference as the official history and

for such actions by requiring the court of the "requested State," or the country to which the child has been removed, to return a wrongfully removed or retained child to his or her country of habitual residence, unless the removing party establishes an exception or defense to return. Hague Convention, art. 12. Unless and until there is a determination that the child need not be returned, "the judicial or administrative authorities of the Contracting State to which the child has been removed or in which it has been retained shall not decide on the merits of rights of custody." *Id.* art. 16. "[T]he Convention rests implicitly upon the principle that any debate on the merits of the question, *i.e.* of custody rights, should take place before the competent authorities in the State where the child had its habitual residence prior to its removal . . . ." *Pérez-Vera Report* at 430, ¶ 19.

Articles 3, 12, and 13 are the main provisions that the courts of contracting states must apply in adjudicating Hague petitions. Article 12, in relevant part, requires that

> [w]here a child has been wrongfully removed or retained in terms of Article 3 and, at the date of the commencement of the proceedings before the judicial or administrative authority of the Contracting State where the child is, a period of less than one year has elapsed from the date of the wrongful removal or retention, the authority concerned shall order the return of the child forthwith.

Article 3, in turn, provides that a removal or retention is "wrongful" when

---

commentary on the Convention and is a source of background on the meaning of the provisions of the Convention available to all States becoming parties to it." Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed. Reg. 10494, 10503 (Mar. 26, 1986).

(a) it is in breach of rights of custody attributed to a person . . . either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and

(b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

In the event that a petitioning party shows that the child was wrongfully removed or retained, Article 13 provides certain exceptions to Article 12's mandate that the child be returned to his or her habitual residence.[3] Article 13(a) provides that the requested state is not bound to order the return of the child when the petitioner "was not actually exercising the custody rights at the time of removal or retention, or had consented to or subsequently acquiesced in the removal or retention." Article 13(b) contains an exception to return when "there is a grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." By its terms, Article 13 does not require a court to refuse return of the child upon the demonstration of one of the article's defenses. Indeed, American courts have emphasized that "a federal court retains, and should use when appropriate, the discretion to return a child, despite the existence of a defense, if return would further the aims of the Convention." *Friedrich v. Friedrich (Friedrich II)*, 78 F.3d 1060, 1067 (6th Cir. 1996) (citing *Feder v. Evans-Feder*, 63 F.3d 217, 226 (3d Cir. 1995)).

Although these exceptions or defenses are available, numerous interpretations of the Convention caution that

---

[3]Article 20 also provides another exception to the return of a child, not relevant to this case, when the return "would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms."

courts must narrowly interpret the exceptions lest they swallow the rule of return. In her report on the Convention, Pérez-Vera observed that "a systematic invocation of the said exceptions, substituting the forum chosen by the abductor for that of the child's residence, would lead to the collapse of the whole structure of the Convention by depriving it of the spirit of mutual confidence which is its inspiration." *Pérez-Vera Report* at 435, ¶ 34. Expressing similar concerns, the U.S. State Department has noted that "[i]n drafting Articles 13 and 20, the representatives of countries participating in negotiations on the Convention were aware that any exceptions had to be drawn very narrowly lest their application undermine the express purposes of the Convention — to effect the prompt return of abducted children." Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed. Reg. at 10509.

With the framework of the Hague Convention in mind, we turn to the events leading up to the present appeal.

## II.   Factual and Procedural Background

George Petroutsas, a Greek and American dual citizen, and Despina Asvesta, a Greek citizen, married in Watsonville, California on March 10, 2002. In January 2003, the couple settled in Capitola, California. Two years later, Asvesta bore a son (the "child"), the couple's only child. According to Petroutsas, the couple never lived together in Greece. Nonetheless, the child, like his father, is a Greek and American dual citizen and was raised to speak both English and Greek fluently.

By the end of 2005, the couple's marriage had begun to deteriorate due to the couple's diverging goals for their life together.[4] Specifically, Asvesta wanted to return to Greece;

---

[4]The parties dispute the existence of other factors, including infidelity and abuse, that may have led to the failure of their marriage. These allegations are, for the most part, irrelevant to this appeal. To the extent that allegations of abuse are relevant, we take note of them as appropriate.

Petroutsas wanted to stay in the United States. A lengthy e-mail from Petroutsas to Asvesta, dated November 2, 2005, pleaded, "This place is where we must be right now, it makes sense for us, I'm not asking you to like it here . . . . Let us start making right moves together both personally and economically, let me gradually open a chapter of my life in Greece . . . let [the child] grow a little older." The e-mail concluded:

> If you don't agree with the above, to go to Greece slowly, calmer and smarter than giving up everything and leaving, I have to ask you for a divorce, and we won't be neither the first or last. Go to Greece with the child and we will see how I will come to Greece to visit him. I know you neither want or ask for this, but how you have brought these issues to me, this is how you have caused me to react.

On November 8, 2005, with the written consent of Petroutsas, Asvesta and the child, not yet six months old, left for Greece to visit family. Petroutsas' consent stated, "I hereby consent to Despina Asvesta Petroutsas to travel with our son . . . between the following dates[:] November 8, 2005 — December 8, 2005."

Petroutsas maintains that Asvesta told him on November 19 that she was not returning from Greece, a fact Asvesta denies. In any event, on November 29, before his consent expired, Petroutsas called Asvesta in Greece to advise her that he had reported her to authorities in the United States for abducting the child. The following day—while Asvesta and the child were in Greece—Petroutsas filed a petition for dissolution of marriage in the Superior Court of California, County of Santa Cruz (the "California court"). Petroutsas also sought custody of the child. After a hearing at which Asvesta's counsel was present, the California court granted Petroutsas temporary custody of the child.

Asvesta alleges that while she was still in Greece, and before her scheduled date of return from Greece, the Greek police discovered a suitcase left by Petroutsas in Asvesta's family's home containing a gun, handcuffs, leg cuffs, credit cards, a pillow, telephone wires, and bullets. According to Asvesta, the discovery of these items prompted her on December 5, 2005, to file for divorce against Petrousas in the Athens Multimember Court of First Instance ("Athens Multimember Court") and to file for temporary custody of the child with the Athens One-Member Court of First Instance ("Athens One-Member Court"). On December 9, 2005, the Athens One-Member Court issued an injunction granting Asvesta temporary custody of the child and scheduling a hearing on the custody petition for January 9, 2006. That hearing was later postponed.

Back in California, on January 25, 2006, after proceedings in which Asvesta was again represented by counsel, the California court found that the child's habitual residence was Santa Cruz County, California, and concluded that it had jurisdiction to hear the case.[5] The court entered a permanent modifiable order granting Petroutsas sole legal and physical custody of the child and ordering Asvesta to return the child to Petroutsas "immediately."

### Hague Proceedings in Greece

On February 20, 2006, with the California custody order in place, Petroutsas filed a Hague petition for the return of the child to the United States with the United States Central Authority.[6] The petition alleged that Asvesta had wrongfully retained

---

[5] Although the California court in its order used terms that ring of a Hague Convention proceeding, Petroutsas did not seek relief from the California court pursuant to the Hague Convention or ICARA.

[6] The Hague Convention requires each contracting state to designate a "Central Authority" to "coordinate and 'channel' " the cooperation among contracting states that the Convention envisions. *Pérez-Vera Report* at

the child in Greece in violation of Petroutsas' custody rights. The United States Central Authority transferred Petroutsas' petition to Greece's Central Authority. Although the record does not detail how Greece's Central Authority handled the petition, it was eventually filed with the Piraeus One-Member Court of First Instance (the "Greek Hague court"). The Athens Multimember court, where Asvesta filed her custody proceeding, stayed that matter pending resolution of the Hague petition pursuant to Article 16 of the Convention.

On March 23, 2006, the Greek Hague court held a hearing on Petroutsas' petition. Both parties voluntarily appeared. According to Asvesta, the parties had notice of the hearing, were represented by counsel, and were provided with the opportunity to be heard and participate fully through counsel. Petroutsas, on the other hand, alleges that, although a non-lawyer representative of the Greek Ministry of Justice appeared to pursue Petroutsas' petition on his behalf, neither Petroutsas nor his personal lawyer were permitted to speak or testify. Petroutsas argues that the appointed representative was not familiar with the facts of the case and did not adequately represent his interests at the hearing.

The following day, on March 24, 2006, the Greek court issued an order dismissing Petroutsas' petition for the return of the child, concluding that it was "not bound to order the minor's return to the USA."[7] App. at 58. The Greek court found the following pertinent facts:

---

437, ¶ 42; *see also* Hague Convention, art. 6. "The Central Authority of the State where [a wrongfully removed or retained] child is shall take . . . all appropriate measures in order to obtain the voluntary return of the child." *Id.* art. 10. If a Central Authority receives a petition concerning a child not located in that country, "it shall directly and without delay transmit the application to the Central Authority of that Contracting State [where the child is located] and inform that Contracting State and inform the requesting Central Authority or the applicant." *Id.* art. 9.

[7]An official translation of the Greek court's ruling is attached as an appendix to this opinion.

- Petroutsas had assured Asvesta that their "stay in the USA was temporary and that soon they would go back to Greece for permanent settlement."

- Asvesta had to obtain supplemental employment because Petroutsas' job as a real estate broker "yielded a very low income which was not enough to deal with his and the respondent's livelihood needs."

- Since 2004, Petroutsas had "bec[o]me violent towards the respondent, making scenes, . . . talking bad to her, . . . swearing at her and insulting her before third parties, and was inexcusably absent from their house."

- After the birth of the child, Petroutsas "was indifferent to his conjugal and family obligations and was making bad scenes before the eyes of the minor."

- The couple had no "mental communication and physical contact" starting in September 2005 and communicated via e-mail because Petroutsas refused to talk to Asvesta.

- Petroutsas had made particular demands regarding any move he would make to Greece, and told Asvesta that if she did not agree, he would be forced to ask for a divorce.

- Petroutsas "suggested" to Asvesta that she "go to Greece together with their minor child and that he would go there to see" the child.

- Petroutsas consented to Asvesta's departure with the child on November 8, 2005, and gave Asvesta "permission to travel together with their son dur-

ing the period of time from 8 November, 2005 to
8 December, 2005" and that Asvesta had
arranged to return to the United States with her
child and her parents for the Christmas holidays.

• Petroutsas reported Asvesta to the authorities on
November 29, 2005, and threatened Asvesta that
she would go to jail and never see the child again.

• Petroutsas had been unfaithful to Asvesta since
December 2004.

App. at 54-56.

The Greek court concluded that the child had not been "il-
legal[ly]" removed to and retained in Greece by his mother
because (1) "Petroutsas . . . consented . . . to his move and
stay in Greece, giving for this purpose to [Asvesta] a related
written permission and suggesting to her to stay in Greece
together with the minor;" (2) "Petroutsas was not virtually
exercising the right of custody of the person of the minor at
the time of his move, since . . . he was indifferent to his fam-
ily obligations, he was not engaged in the minor's care and
was indifferent to his pyschosomatic [sic] development;" and
(3) there was

> a severe danger that the minor's return to the USA
> to [sic] expose him to mental tribulation, since he
> will be deprived of his mother's presence, affection,
> love and care at the delicate age of 12 months, he
> will be deprived of the security and stability that he
> feels near his mother and his mental bond with her
> will be broken.

App. at 57-58.

Petroutsas did not appeal this ruling because, he alleges, the
appointed representative from the Greek Ministry of Justice

failed to do so. As a result, the Greek court's factual findings remain unchallenged. Petroutsas, however, did file a "cassation appeal." According to the district court testimony of Grigoriou Stilianos, Petroutsas' Greek legal advisor, a cassation appeal is a limited procedural challenge that allows a party to appeal only the legal conclusions of the lower court.[8]

After the Greek Hague court denied Petroutsas' petition, he filed a petition in the Athens Multimember Court custody case seeking visitation with the child in Greece. While this petition and Asvesta's original custody petition were pending, the parties, through counsel, entered into a voluntary settlement agreement establishing a schedule pursuant to which Petroutsas could visit the child in Greece. Petroutsas also filed a petition in the Piraeus One-Member Court of the First Instance[9] seeking recognition of the California court's original January 25, 2006, order that granted him temporary custody of the child. On March 13, 2007, the court declined to do so, and its order was affirmed by the Piraeus Court of Appeal.

On April 23, 2007, the Athens One-Member Court finally held a hearing to consider Asvesta's original petition for custody of the child and Petroutsas' petition for visitation rights. The court awarded temporary custody to Asvesta and granted Petroutsas supervised visitation in Greece. A month later, however, the California court modified its prior order, granted

---

[8]The cassation appeal is apparently still pending. One member of the Greek Supreme Court, however, issued an opinion on whether to accept the appeal. That opinion stated that the Greek court that ruled on the Hague petition had erred as a matter of law because it did not follow the procedural rules of evidence at the Hague hearing. Stilianos testified that the Greek Supreme Court would likely overturn the Greek Hague court's order and remand for a new hearing and that the court would likely issue a decision in the cassation appeal by April 2008.

[9]Although Petroutsas' Hague petition was filed in the Piraeus One-Member Court of First Instance, this proceeding, it appears, was completely separate from the Greek Hague proceeding; two different judges presided over the two matters.

temporary sole custody of the child to Petroutsas, and ordered the parties to mediate their custody and visitation dispute in Greece.

In July 2007, during supervised visitation with his son, Petroutsas took the child, fled from Greece to Canada and then returned to California where, as far as the record reflects, the child remains to this day. Petroutsas asserts that he took the child from Greece under the authority of the California court order that granted him sole legal and physical custody of the child. Asvesta, on the other hand, viewed Petroutsas' action as an abduction, reported the abduction to the Greek police, filed charges with the Greek police against Petroutsas for kidnapping, and filed a petition for the return of the child to Greece under the Hague Convention in the U.S. District Court for the Northern District of California.

### *Hague Proceedings in the United States*

Asvesta filed her Hague petition on October 31, 2007, asserting that Petroutsas had abducted the child from Greece, the child's habitual residence. The court issued an order to show cause for Petroutsas to appear on November 16, 2007, with the child; Petroutsas did not appear. After the court issued a warrant for Petroutsas' arrest and placed the child in the national database for missing persons, Petroutsas appeared with counsel and the child for a show cause hearing. Following an evidentiary hearing and after encouraging the parties to reach a voluntary settlement agreement, the district court orally granted Asvesta's petition.

In so ruling, the court determined that the initial question it faced was "simply, whether it should or shouldn't recognize and accord comity to the Hague order entered by the courts of Greece." The court, in its brief discussion of whether the "Greek court faithfully applied the Hague convention," observed that "the Hague order entered in Greece could be

criticized as giving undue weight to matters that are not properly considered under the Hague convention."

Nonetheless, the court stated that "[i]f all this court had before it were the Hague order from Greece and if [Petroutsas] had faithfully carried out his responsibilities as a litigant with respect to that and other orders, I think this would be a much harder case as a legal matter than it actually is." The court was "compell[ed]" by Petroutsas' failure to comply with both the Greek Hague Convention order and the California court's order to mediate custody and visitation issues in Greece, describing the circumstances as "simply a situation where the two countries or the two courts that have exercised jurisdiction over this child both made orders, both which have been violated by Mr. Petroutsas." The court concluded that "under both circumstances [it had] no legal choice other than to grant the petition."

On January 17, 2008, the district court ordered that the child be returned to Greece, "the minor child's habitual residence," but simultaneously ordered a stay of the child's return pending appeal.

## III. Discussion

Given the district court's limited ruling, our sole inquiry is whether the district court properly extended comity to the Greek court's denial of Petroutsas' Hague Convention petition.[10] In implementing the Hague Convention through enactment of ICARA, Congress recognized "the need for uniform international interpretation of the Convention," 42 U.S.C. § 11601; we therefore approach our task with a view to the decisions

---

[10]Petroutsas also argues that the district court improperly granted Asvesta's petition on the basis of Petroutsas' violation of the California court order requiring the parties to mediate in Greece. Although Petroutsas characterized this argument as a separate issue from the question of comity, we consider it in the context of our comity analysis.

of other authoritative state and federal courts, and courts of other contracting nations. *See Gonzalez v. Gutierrez*, 311 F.3d 942, 952 (9th Cir. 2002) ("one of the purposes of the Convention is to create a uniform body of international law among foreign courts"); *Mozes v. Mozes*, 239 F.3d 1067, 1072 (9th Cir. 2001) ("To achieve the uniformity of application across countries, upon which depends the realization of the Convention's goals, courts must be able to reconcile their decisions with those reached by other courts in similar situations.").

Although we have not specifically addressed the standard of review applicable to our review of the district court's extension of comity to a foreign court's Hague decision, our case law suggests that we review for abuse of discretion. *See Stock West Corp. v. Taylor*, 964 F.2d 912, 917-18 (9th Cir. 1992) (reviewing for abuse of discretion the district court's extension of comity to a tribal court in declining jurisdiction); *Bird v. Glacier Elec. Coop., Inc.*, 255 F.3d 1136, 1140 (9th Cir. 2001) (adopting a de novo standard of review, rather than abuse of discretion review, in declining to enforce a tribal court judgment because even though "the decision to recognize a foreign judgment is discretionary," the particular issue in that case underlying the extension of comity involved a question of law).

The Second Circuit in *Diorinou v. Mezitis*, 237 F.3d 133, 138-39 (2d Cir. 2001), however, suggested that the context in which comity is extended or denied determines the standard of review. There, the court noted that a district court's application of principles of comity in deciding whether (1) to abstain from hearing a case in favor of a foreign proceeding or (2) to enforce a foreign judgment should be reviewed for abuse of discretion, as our own cases suggest. *Id.* at 130. It held, however, that it would review de novo the district court's application of the doctrine of comity in that case because the district court had applied the doctrine in "consider[ing] whether to accept the adjudication of a foreign tribunal on a cause of action or a particular issue . . . ." *Id.* at

139. Although it is not clear from the district court's order here, it appears that in extending comity to the Greek court's decision, the district court determined that the Greek court's adjudication of a particular issue or issues in Petroutsas' petition was binding on issues that were dispositive of Asvesta's petition.[11] *Diorinou* therefore suggests that we review de novo the district court's decision to extend comity to the Greek court's denial of Petroutsas' petition.

Although we believe that the uncertainty of our standard review is worth noting, we need not decide here whether to review the district court's determination de novo or for an abuse of discretion. Under either standard of review, we conclude that the district court should not have extended comity to the Greek court's Hague decision.

Petroutsas asserts that the district court improperly extended comity to the Greek court's earlier Hague Convention determination. He argues that the Greek court's ruling is not worthy of comity because it improperly focused on matters relevant to the merits of a custody determination and made findings plainly unsupported or contradicted by the evidence.[12] We agree with Petroutsas. The Greek court's analysis

---

[11]We conclude that the district court employed the doctrine of comity in this fashion because it is clear that it was not invoking comity to abstain from adjudicating Asvesta's Hague petition or to enforce the Greek court's denial of Petroutsas' petition. Further, the district court could not have properly determined that the Greek court's adjudication of Petroutsas' cause of action under the Hague Convention was directly binding on its own consideration of Asvesta's separate cause of action. In denying Petroutsas' petition, the Greek court considered whether Asvesta's retention of the child in Greece, rather than Petroutsas' subsequent removal of the child to the United States, constituted wrongful removal or retention. The district court, therefore, could only properly determine that the Greek court's rulings on certain issues, such as its Article 3 determination, were binding on certain issues in Asvesta's petition.

[12]In support of his appeal, Petroutsas requests that we take judicial notice of the U.S. State Department's "Report on Compliance with the Hague Convention on the Civil Aspects of International Child Abduction" (2007). Because it was filed with the district court, the request for judicial notice is unnecessary, and we therefore deny the request.

of the merits of Petroutsas' Hague petition misapplies the provisions of the Convention, relies on unreasonable factual findings, and contradicts the principles and objectives of the Hague Convention. We therefore hold that the district court improperly extended comity to the Greek court's Hague decision, reverse the judgment, and remand with directions to the district court to conduct its own Hague convention analysis.[13]

## A.  International Comity and the Hague Convention

The district court granted Asvesta's Hague petition and ordered the child returned to Greece after extending "comity" to the Greek court's 2006 Hague Convention decision.

[1] "The extent to which the United States, or any state, honors the judicial decrees of foreign nations is a matter of choice, governed by 'the comity of nations.' " *Wilson v. Marchington*, 127 F.3d 805, 808 (9th Cir. 1997) (quoting *Hilton v. Guyot*, 159 U.S. 113, 163 (1895)). "Comity is 'the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation.' " *Dependable Highway Express, Inc. v. Navigators Ins. Co.*, 498 F.3d 1059, 1067 (9th Cir. 2007) (quoting *Hilton*, 159 U.S. at 164). Extension of comity to a foreign judgment is "neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other." *Id.* (internal quotation omitted).

As this court recognized in *Marchington*, "*Hilton* [*v. Guyot*] provides the guiding principles of comity[:]"

> [W]here there has been opportunity for a full and fair trial abroad before a court of competent jurisdiction,

---

[13]We therefore need not address Petroutsas' additional argument that the district court also erred in extending comity to the Greek court's order because the Greek court allegedly denied Petroutsas his right to procedural due process.

conducting the trial upon regular proceedings, after due citation or voluntary appearance of the defendant, and under a system of jurisprudence likely to secure an impartial administration of justice between the citizens of its own country and those of other countries, and there is nothing to show either prejudice in the court, or in the system of laws under which it was sitting, or fraud in procuring the judgment, or any other special reason why the comity of this nation should not allow it full effect, the merits of the case should not, in an action brought in this country upon the judgment, be tried afresh, as on a new trial or an appeal, upon the mere assertion of the party that the judgment was erroneous in law or in fact.

*Hilton*, 159 U.S. at 202-03; *see also Marchington*, 127 F.3d at 810 & n.4.

**[2]** The few United States courts that have addressed the extension of comity to Hague Convention orders of foreign courts "have observed that comity 'is at the heart of the Hague Convention.' " *Diorinou*, 237 F.3d at 142 (quoting *Blondin v. Dubois*, 189 F.3d 240, 248 (2d Cir. 1999)). The Second Circuit has noted that, where comity is at issue, a court properly begins its analysis "with an inclination to accord deference to" a foreign court's adjudication of a related Hague petition. *Diorinou*, 237 F.3d at 145. We agree. Such an approach is consistent with the Convention drafters' primary concern "with securing international cooperation regarding the return of children wrongfully taken by a parent from one country to another." *Gonzalez*, 311 F.3d at 944. *Diorinou*'s approach is also consistent with the relatively narrow grounds, set forth in *Hilton*, upon which courts may rely in withholding comity.

**[3]** We recognize that *Hilton* cautions that "[t]he merits of [a foreign judgment] should not, in an action brought in this

country upon the judgment, be tried afresh." 159 U.S. at 202-03. However, the two federal courts of appeal that have considered whether to extend comity to foreign Hague Convention judgments—the Second Circuit in *Diorinou* and the Third Circuit in *Carrascosa v. McGuire*, 520 F.3d 249 (3d Cir. 2008)—both looked closely at the merits of the foreign court's decision in determining whether comity could properly be extended to its judgment.

In *Diorinou*, the Second Circuit observed that "[a]lthough deference as a matter of comity often entails consideration of the fairness of a foreign adjudicating system . . ., a case-specific inquiry is sometimes appropriate." 237 F.3d at 143. In doing so, it cited *Hilton's* statement that comity may be withheld if "other special reason[s]" exist. *Id.* (quoting 149 U.S. at 202). *Diorinou* also cited commentary in the Restatement of Foreign Relations that states generally that "[a] particular case may disclose such defects as to make the particular judgment not entitled to recognition." *Id.* (quoting Restatement (Third) of Foreign Relations § 428 cmt. b (1987)) (internal quotation marks omitted).

*Diorinou* draws upon these "other" categories in *Hilton* and the Restatement of Foreign Relations to justify its analysis of the merits of a Greek court's adjudication of a Hague petition filed by a father, Mezitis, seeking the return of his two dual-citizen children to the United States from Greece, where they had been retained by their mother, Diorinou. The Greek court had rejected Mezitis' petition, concluding that (1) Diorinou had not wrongfully retained the children in Greece because, the Second Circuit surmised, Mezitis was not exercising "actual care" of the children within the meaning of Article 3 of the Convention at the time of the retention; (2) Mezitis consented to Diorinou's retention of the children in Greece and therefore the court, pursuant to Article 13(a) of the Convention, was not obligated to return the child to the United States; and (3) the children's return to the United States would expose them to a grave risk of harm and, therefore, the court

was not obligated to return the children under Article 13(b) of the Convention. 237 F.3d at 133.

As in this case, some time after the Greek court denied the petition, the father took the children to the United States. The mother then filed a petition in a United States district court under the Convention for return of the children to Greece. *Id.* at 136. In granting the mother's petition, the district court extended comity to the Greek court's determination that the mother had not wrongfully retained the children in Greece, and in light of that determination, concluded that the children's habitual residence was Greece. *Id.* at 142 (noting that a country may not be a child's habitual residence if, under the Convention, the child had been wrongfully removed to or retained in that country).

The Second Circuit affirmed the district court's extension of comity, but only after emphasizing its misgivings with certain aspects of the Greek court's decision. *Id.* at 147. Specifically, the court was concerned with the Greek court's finding that the father consented to the children's stay in Greece when the father had initiated a custody proceeding in New York only a week after leaving a family vacation as a result of marital problems. *Id.* at 136, 145. The court also expressed doubt about the Greek court's finding that the children would face a grave risk of harm if returned to the United States, observing that the Greek court's application of Article 13(b)'s grave risk exception was in tension with the Hague Conference's intent that exceptions to return be drawn narrowly. *Id.*

Despite these concerns, the court extended comity to the Greek court's judgment. Significantly, after reviewing the record before the Greek court, the Second Circuit determined that the Greek court's finding that the mother had not wrongfully retained the children in Greece was "entirely supportable," because it was clear that the father was not exercising his custodial rights at the time of the retention. *See id.* The Greek court's dubious determinations regarding Article 13

exceptions to return were therefore immaterial to the outcome of the case.

The Third Circuit in *Carrascosa*, on the other hand, declined to extend comity to a Spanish court's Hague order. 520 F.3d at 263. In so doing, the court, like the Second Circuit in *Diorinou*, examined the merits of the Spanish court's analysis under the Convention. In this case, a mother had taken her child to Spain in violation of a parenting agreement between her and the child's father that forbade either parent to take the child out of the country without the other's consent. *Id.* at 256. When the father filed a Hague petition in Spain for the child's return, a Spanish court determined that the parenting agreement implicitly assigned full custody of the child to the mother. *Id.* at 257. On the basis of this finding, the Spanish court denied the petition, apparently concluding that the parenting agreement barred the father from establishing that he had custodial rights over the child, an element necessary to a showing of wrongful removal under Article 3. *See id.* at 258. A New Jersey court, however, ordered the mother to return the child and eventually held her in contempt and jailed her for failing to comply with the order. The mother petitioned for a writ of habeas corpus in the district court, arguing that the district court should extend comity to the Spanish court's determination that her removal of the child to Spain was not wrongful and rule that she was not required to comply with the U.S. court's order to return the child. *Id.* at 251.

The district court rejected this argument. The Third Circuit affirmed the district court and its reasoning that the Spanish court "ignored the mandates of the Hague Convention by impermissibly making custody determinations and failing to address and apply New Jersey law," even though it was undisputed that the child's habitual residence was New Jersey. *Id.* at 258, 260. The Third Circuit, refusing to extend comity to the Spanish court, concluded that the Spanish court's decision "departed from the fundamental premise of the Hague Con-

vention and violated principles of international comity by not applying New Jersey law." *Id.* at 263.

The Ontario Court of Appeal in *Pitts v. De Silva*, 2008 ON.C. LEXIS 34 (Jan. 10, 2008), adopted an approach similar to that of *Diorinou* and *Carrascosa* in determining whether it should accord deference to the Tenth Circuit's affirmance of a district court's Hague Convention judgment that refused under Article 13 to return a child to Canada. The Ontario court observed that "[t]he combination of comity, on the one hand, and of the need to preserve the Hague Convention's effectiveness, on the other, calls for courts to avoid interfering, as much as possible, with foreign interpretations of the Convention." 2008 ON.C. Lexis 34 at *24. Nonetheless, the court determined that in some instances, deference could be properly withheld if the foreign decision "evinces a clear misinterpretation of the Hague Convention or fails to meet a minimum standard of reasonableness." *Id.* As in *Diorinou* and *Carrascosa*, the Ontario Court of Appeals considered whether the district court, which the Tenth Circuit had affirmed, conducted a proper analysis under Article 13. *Id.* at 27. Concluding that it had, the Ontario court extended deference to the Tenth Circuit's decision. *Id.* at 28.

**[4]** We agree that, in the context of the Hague Convention, a court's decision to extend comity to a foreign judgment may be guided by a more searching inquiry into the propriety of the foreign court's application of the Convention, in addition to the considerations of due process and fairness outlined specifically in *Hilton*. Generally, the issue of comity arises when a foreign court has entered a judgment after applying its own substantive and procedural laws, *see, e.g.*, *Hilton*, 159 U.S. at 114-20; in these cases, *Hilton*'s admonition to avoid a reexamination of the merits of a foreign court's judgment seems most relevant. Here, however, we consider whether the district court properly extended comity to a foreign court that applied the Hague Convention—a legal framework agreed upon and implemented by all contracting nations. In this con-

text, we are in a better position to examine the merits of a foreign court's Hague decision in deciding whether that decision warrants deference. Although we recognize that our careful examination of the merits of another contracting nation's Hague adjudication could, in some circumstances, undermine the mutual trust necessary for the Convention's continued success, we also recognize that its success relies upon the faithful application of its provisions by American courts and the courts of other contracting nations. For this reason, we follow the path charted by *Diorinou*, *Carrascosa*, and *Pitts* and conclude that we may properly decline to extend comity to the Greek court's determination if it clearly misinterprets the Hague Convention, contravenes the Convention's fundamental premises or objectives, or fails to meet a minimum standard of reasonableness.

## B. The District Court's Consideration of Petroutsas' Failure to Comply with the California and Greek Court Orders

Before applying these principles to the Greek court's Hague determination, we first address Petroutsas' argument that the district court committed reversible error by granting Asvesta's petition, at least in part, on the basis of Petroutsas' failure to comply with two orders: the California state court's order to mediate custody and visitation issues in Greece and the Greek court's Hague order. Petroutsas argues that his compliance with these orders was irrelevant to the district court's Hague Convention inquiry.

We agree that the district court did rely to a considerable extent on Petroutsas' failure to comply with the California and Greek court orders in granting Asvesta's petition. The court specifically noted that Petroutsas had violated the California court's order by failing to mediate custody and visitation issues in Greece, and had "ultimately treated [the Greek court's Hague order] as if it didn't exist." by bringing the

child back to the United States in 2006.[14] The court opined that it would be a "much harder case as a legal matter" if Petroutsas had complied with these orders.

**[5]** We understand the district court's concern with Petroutsas' failure to abide by the various court orders in light of the contentious dispute between Petroutsas and Asvesta and the tactics both parties employed in battling for the custody of their son. However, we agree with Petroutsas that, in the context of this case, the parties' conduct was not the proper focus of the court's inquiry. Rather, the question before the court was whether it should extend comity to the Greek court's decision—an inquiry that properly focuses on the process and judgment of the foreign court. *See Hilton*, 159 U.S. at 202-03.

**[6]** The district court, however, explicitly acknowledged that the question of comity was the only question before it. We therefore view the court's references to Petroutsas' actions in its oral ruling as part of its comity analysis—not as a separate basis for granting the petition—and decline to reverse the district court solely on the basis of its consideration of Petroutsas' conduct. Rather, we turn to the merits of the district court's overall comity analysis, unencumbered by any consideration of Petroutsas' actions.

---

[14]We do not reach the question of whether the district court correctly found that Petroutsas did, in fact, violate the California state court's mediation order and the Greek court's Hague ruling. The court's concern with Petroutsas' compliance with the Hague order seems unwarranted. The Greek court simply denied Petroutsas' Hague petition and refused to order the return of the child to the United States; it did not grant custody to Asvesta or forbid the child to be taken back to the United States. Rather, by denying the petition, it allowed the Greek courts to resolve Asvesta's and Petroutsas' underlying custody dispute. *See* Hague Convention, art. 16. As a result, Petroutsas' actions in bringing the child back to the United States would not have violated the Greek Hague order; if anything, he may have violated the Athens One-Member Court order that granted him only supervised visitation with the child.

### C. The Greek Court's Hague Determination

The district court properly extended comity to the Greek court's decision unless, as discussed above, that decision clearly misinterpreted the Hague Convention, departed from the Convention's fundamental premises, or failed to meet a minimum standard of reasonableness.

As noted in our discussion of the standard of review above, we assume that the district court determined that comity required it to accept the Greek court's resolution of certain issues in Petroutsas' petition as binding on its own resolution of Asvesta's petition. Although it is not clear from the district court's ruling, the briefing of the parties, both before the district court and before us,[15] suggests that the district court determined that principles of comity required it to find that the child's habitual residence was Greece and that Petroutsas therefore had removed the child in violation of the custody rights that the Greek courts had granted to Asvesta. The district court, however, did not identify the specific Greek court rulings to which it extended comity and upon which it relied in ruling that Greece was the child's habitual residence.[16] The Greek court, though, denied Petroutsas' petition on the basis of several grounds: (1) the mother's removal and retention of

---

[15]Before the district court, Petroutsas argued that Asvesta could not claim that Greece was the child's habitual residence because the child's presence there resulted from Asvesta's wrongful retention. Asvesta, for her part, argued that the Greek court had already determined that Asvesta had not wrongfully retained the child in Greece, and that the district court should grant comity to that determination.

[16]The one issue that both the district court and the Greek court had to resolve in adjudicating Asvesta's and Petroutsas' petitions, respectively, was the child's habitual residence. Had the Greek court made a habitual residence determination and concluded that it was Greece, the basis for the district court's habitual residence determination would be more apparent from the record. As we discuss below, however, the Greek court's decision does not mention, let alone address, which country was the child's habitual residence.

the child in Greece was not "illegal;" (2) Petroutsas consented to the child's move to and stay in Greece, (3) Petroutsas was not exercising his right of custody of the child at the time of the removal; and (4) the child's separation from Asvesta if returned to the United States would pose a grave risk of harm to the child. Because the particular ground or grounds upon which the district court relied are not clear, we consider each ground relied upon by the Greek court, as well as the Greek court's decision as a whole, in order to determine whether the district court's extension of comity was proper.

### 1.   The Greek Court's Overall Hague Convention Analysis

We begin by observing that the overall structure and focus of the Greek court's analysis deviates from the approach set forth in the Convention. First, the Convention is clear that a court considering a Hague petition should not consider matters relevant to the merits of the underlying custody dispute such as the best interests of the child, as these considerations are reserved for the courts of the child's habitual residence. *See Pérez-Vera Report*, at 430, ¶ 19. The Convention instead requires courts to perform more objective inquiries, such as the determination of the child's habitual residence and whether the child was wrongfully removed or retained.

Here, the Greek court strayed from the objective inquiries prescribed by the Convention and focused on matters largely irrelevant to its ultimate decision. Much, if not most, of the court's factual findings center on the breakdown of the couple's relationship and Petroutsas' treatment of Asvesta, including his alleged infidelity, failure to be the sole bread-winner for the family, and refusal to speak to Asvesta in the last months of their marriage. *See* App. at 54-56. The Greek court noted several incidents between Asvesta and Petroutsas in which the child may have been involved, including situations in which Petroutsas made "bad scenes before the eyes of the minor" and threatened Asvesta that she would never see

the child again. App. at 55, 56. Although these incidents could be relevant to the Greek court's analysis of the grave risk exception under Article 13 of the Convention, the court's vague factual findings do not indicate how the child, not yet a year old at the time, would have been affected by the incidents. While Asvesta may have experienced trying circumstances in her marriage to Petroutsas, these circumstances are not the proper focus of a Hague Convention inquiry.

Further, the Greek court's analysis is largely untethered from the relatively structured inquiry required by the Hague Convention. Although the court determined, in a conclusory fashion, that Asvesta's removal of the child to Greece was not "illegal," it is unclear whether this constituted a determination under Article 3 that the removal or retention was not wrongful, or whether the Greek court skipped the Article 3 determination and relied solely on Article 13 exceptions to return to justify its denial of Petroutsas' petition. The Greek court's finding that Petroutsas failed to exercise his custodial rights at the time of removal was the only element of the Article 3 inquiry that the court addressed in its decision. That determination, however, could have served either as a basis for finding that Asvesta's removal of the child was not wrongful under Article 3(b) or as an exception to return under Article 13(a).[17]

While we understand that our concerns with the clarity of the Greek court's analysis may result from translation errors or differences between Greek and American analytical styles,

---

[17]For the purposes of our analysis, we give the Greek court the benefit of the doubt by assuming that it conducted an Article 3 inquiry and determined that Asvesta's actions were not wrongful because Petroutsas was not exercising his custodial rights at the time of the removal and retention. To do otherwise would assume that the Greek court completely overlooked Article 3, which "as a whole constitutes one of the key provisions of the Convention, since the setting in motion of the Convention's machinery for the return of the child depends upon its application." *Pérez-Vera Report* at 444, ¶ 64.

we believe our concerns are warranted in light of the Hague Convention's straightforward analytical framework and its clear focus on objective inquiries such as the determination of wrongful removal under Article 3. The overall lack of clarity and improper focus of the Greek court's ruling provides a disturbing backdrop to each of the various grounds the Greek court ultimately relied upon to deny Petroutsas' petition.

## 2. Article 3: Wrongful Retention

**[7]** As discussed above, we assume that the Greek court denied Petroutsas' petition because, in part, he failed to show that he was exercising his custodial rights to the child at the time of removal and therefore could not establish that Asvesta had wrongfully retained the child in Greece. Article 3 of the Convention provides that a petitioning party can demonstrate wrongful retention only when the retention of the child is in breach of the petitioning party's custodial rights under the law of the child's habitual residence and, at the time of retention, the petitioning party was exercising those rights. Here, the Greek court's Article 3 ruling was marked by serious defects, principally, its failure to make the underlying determination of the child's habitual residence, and also its legally erroneous and factually unsupported finding that Petroutsas failed to exercise his custody rights.

First, the Greek court completely failed to determine the child's habitual residence in its Hague Convention analysis, even though the resolution of this issue is central to a court's Article 3 inquiry and is perhaps the most important inquiry under the Convention. Asvesta's arguments that the Greek Hague court did make such a determination are without foundation. Although the Greek court made factual findings that may have been relevant to a habitual residence determination, the Greek court never concluded that Greece, rather than the United States, was the child's habitual residence; in fact, it never mentioned the term "habitual residence" in its analysis. Notably, had the Greek court determined that Greece was the

child's habitual residence, such a determination would have obviated the need to make an Article 3 determination, as the Convention would not have required the court to return the child to California if it was not the child's habitual residence.

The Greek court's failure to determine the child's habitual residence greatly undermines its wrongful retention analysis. In *Mozes*, we emphasized that " '[h]abitual residence' is the central—often outcome-determinative—concept on which the entire system is founded." *See* 239 F.3d at 1072. The identification of the child's habitual residence is crucial to a Hague inquiry because "[t]he relevant custody rights are those recognized by the State of habitual residence, and it is the State of habitual residence to which the child should be returned and where the ultimate merits of the custody fight are to be decided." Linda Silberman, *Hague Convention on International Child Abduction: A Brief Overview and Case Law Analysis*, 28 Fam. L. Q. 9, 20 (1994).

**[8]** In particular, the habitual residence determination is central to a court's wrongful removal inquiry under Article 3, because the law of the habitual residence is used to determine whether the petitioning party has custody rights to the child, whether those rights have been violated by the removal or retention of the child, and arguably, whether those rights were sufficiently "exercised" by the petitioning party at the time of the removal. *See Friedrich II*, 78 F.3d at 1065 (noting that "American courts are not well suited to determine the consequences of parental behavior under the law of a foreign country" and observing the difficulty of "the task of deciding, prior to a ruling by a court in the abducted-from country, if a parent's custody rights should be ignored because he or she was not acting sufficiently like a custodial parent").

**[9]** The Greek court's failure to make a habitual residence determination consequently casts doubt on its entire Article 3 determination. Without knowing whether the habitual residence of the child was the United States or Greece, the court

could not have known the appropriate law to apply in determining whether Petroutsas had custodial rights to the child, whether he was exercising those rights, or whether Asvesta had violated his rights by removing and retaining the child in Greece.

In addition to the Greek court's failure to address the key question of habitual residence, its stated basis for determining that Asvesta's actions were not wrongful under Article 3 was its finding that Petroutsas was, at the time of the removal, "indifferent to his family obligations, . . . not engaged in the minor's care, and was indifferent to his psychosomatic [sic] development." App. at 58. We have difficulty, however, in discerning the evidentiary basis for this finding. Other than the court's finding that Petroutsas "was making bad scenes before the eyes of the minor," App. at 55, the Greek court made no factual findings regarding Petroutsas' lack of care for the child, but rather focused on Petroutsas' treatment of Asvesta. While Petroutsas may not have treated Asvesta as he should have, his behavior toward her does not bear directly on his treatment of the child or his exercise of his custodial rights.

The lack of appropriate factual findings on Petroutsas' failure to exercise his custody rights is even more concerning when the Greek court's reasoning is considered in light of the minimal showing that is required under Article 3(b). Pérez-Vera notes that Article 3(b) requires that "the applicant provide only some preliminary evidence that he actually took physical care of the child, a fact which normally will be relatively easy to demonstrate." *Pérez-Vera Report* at 448-49, ¶ 73 (observing that because Article 13(b), which provides an exception or defense to return, requires the non-petitioning person to show that the petitioning parent was not exercising custodial rights, "we may conclude that the Convention, taken as a whole, is built upon the tacit presumption that the person who has care of the child actually exercises custody over it.").

Indeed, we and other courts have held that a petitioner's burden under Article 3(b) is minimal. For example, in *Mozes*, we determined that the petitioning father had been "exercising his parental rights and responsibilities up until the time [the mother] sought custody." 239 F.3d at 1085. There, the father "had remained in regular contact with his family, visited them several times, and 'provided all finances needed to support his wife and children in California.' " *Id.* (quoting *Mozes*, 19 F. Supp. 2d 1108, 1111 (C.D. Cal. 1998)). Nothing in the record suggests that Petroutsas' conduct toward the child here did not rise to the same level of care.

The Sixth Circuit in *Friedrich II* explained that requiring a petitioning party to meet a high bar in demonstrating the actual exercise of custody rights contradicted the Convention's objective to reserve custody determinations for the country of habitual residence. 78 F.3d at 1065. *Friedrich II* held that

> if a person has valid custody rights to a child under the law of the country of the child's habitual residence, that person cannot fail to "exercise" those custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child. Once it determines that the parent exercised custody rights in any manner, the court should stop—completely avoiding the question whether the parent exercised the custody rights well or badly.

*Id.* at 1066. In justifying this approach, the court explained that a foreign court's "decision about the adequacy of one parent's exercise of custody rights is dangerously close to . . . the merits of the custody dispute" and that foreign courts are not well-suited to determine "if a parent's custody rights should be ignored because he or she was not acting sufficiently like a custodial parent." *Id.* Here, the Greek court's analysis of whether Petroutsas exercised his custody rights goes beyond

the threshold determination required by the Convention and, in doing so, delves into matters more appropriately reserved for the courts of the child's habitual residence.

[10] The Greek court's Article 3 determination is thus marked by numerous flaws, most notably, the court's complete failure to address a key provision of the Convention—a failure that tainted its wrongful retention analysis as a whole. We therefore conclude that the Greek court's wrongful retention determination resulted from a clear misapplication of the provisions of the Hague Convention.

### 3.    Article 13(a): Consent

[11] The Greek court also denied Petroutsas' petition on the basis of its finding that Petroutsas consented to the child's removal and stay in Greece.[18] Under Article 13(a), a contracting nation "is not bound to order the return of the child if the person . . . which opposes its return establishes that the person . . . having the care of the person of the child . . . had consented to or subsequently acquiesced in the removal or retention." Two pieces of evidence provided the basis for the Greek court's conclusion that Petroutsas consented: (1) a statement in the November 2, 2005, e-mail from Petroutsas to Asvesta, "Go to Greece with the child and we will see how I will come to Greece to visit him," and (2) a later writing, notarized on November 11, 2005, in which Petroutsas gave permission to Asvesta to travel with the child from November 8, 2005, to December 8, 2005.

[12] We conclude that the Greek court's factual determination is completely unsupported, and is indeed contradicted by, this evidence. First, the statement in the November 2 e-mail does not unequivocally demonstrate that Petroutsas consented

---

[18]Although the Greek court did not expressly refer to Article 13(a) in its decision, we infer that its analysis was conducted pursuant to that section.

to the child's indefinite stay in Greece. The statement could be read to express consent either for the child to travel to Greece temporarily or for the child to move to Greece permanently. Read in the context of the entire e-mail, in which Petroutsas pleads for Asvesta to stay in the United States for the time being, it seems more plausible that Petroutsas did *not* consent to the child's indefinite or permanent relocation to Greece.

Further, Petroutsas' later written consent for Asvesta to *travel* with the child directly contradicts the Greek court's finding of that Petroutsas consented to the child's indefinite stay in Greece. In that writing, Petroutsas specified the time during which he consented to Asvesta traveling with their son: between November 8, 2005, and December 8, 2005. Petroutsas filed his Hague petition in Greece for the return of the child well after this time period elapsed. The Greek court's apparent dismissal of this evidence in favor of the earlier e-mail was unwarranted, because Petroutsas' explicit consent for Asvesta to travel with their son for a finite period of time occurred later in time and closer in proximity to Asvesta's removal and retention of the child in Greece than the earlier and more vague November 2 e-mail.

Finally, for the Greek court to conclude that Petroutsas gave consent for purposes of Article 13(a), it also had to determine that Petroutsas gave consent as a person "having the care of the person of the child" at the time of the removal or retention. The Greek court's consent determination, therefore, is arguably at odds with its determination that Petroutsas was not exercising his right of custody at the time of Asvesta's removal or retention of the child. *See Pérez-Vera Report* at 448-49, ¶ 73 (noting that Article 3(b) requires that "the applicant provide only some preliminary evidence that he actually took physical care of the child" in order to show the exercise of custodial rights).

[13] Although we are reluctant to disregard the factual findings of a foreign court, the lack of evidentiary support for the

Greek court's finding of consent renders its Article 13(a) determination unreasonable.

### 4.    Article 13(b): Grave Risk of Harm

We turn finally to the Greek court's third ground for denying Petroutsas' petition—its determination that the child would face a grave risk of harm if he were returned to the United States. Specifically, the Greek court found that the child faced

> a severe danger that [his] return to the USA to [sic] expose him to mental tribulation, since he will be deprived of his mother's presence, affection, love and care at the delicate age of 12 months, he will be deprived of the security and stability that he feels near his mother and his mental bond with her will be broken.

App. at 58. This determination was made, apparently, pursuant to Article 13(b)'s exception to the return of the child where "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Again, we find the Greek court's determination to be wholly unsupported.

[14] First, the Greek court, in reaching this conclusion, determined—or assumed—that the child's separation from his mother at a young age would be more traumatic than his separation from his father. In doing so, the Greek court stepped out of its role as a Hague Convention tribunal by inquiring into the best interests of the child. Although we express no views on the wisdom of such a determination, it is a determination pertinent only to the merits of the underlying custody dispute which must be resolved not by a Hague court, but rather the courts of the child's habitual residence.

Further, the Greek Hague court's determination that the child faced a grave risk of harm if returned to the United States relied on an impermissibly broad interpretation of Article 13(b). United States courts have consistently recognized that, like the other exceptions to return of a child under the Convention, Article 13(b)'s exception for grave risk should be "narrowly drawn." *In re Adan*, 437 F.3d 381, 395 (3d Cir. 2006) (citing *Feder*, 63 F.3d at 226); *see also Blondin*, 189 F.3d at 246; *Blondin v. Dubois*, 238 F.3d 153, 162 (2d Cir. 2001) (observing that "grave risk of harm" arises in "situations in which the child faces a real risk of being hurt, physically or psychologically, as a result of repatriation").

Courts of other contracting nations have also adopted a narrow view of Article 13(b)'s grave risk exception. *See Friedrich II*, 78 F.3d at 1068. For example, the Supreme Court of Canada held in *Thomson v. Thomson*, [1994] 3 S.C.R. 551, that a petitioner may demonstrate grave risk of harm only when the harm "amounts to an intolerable situation." In the United Kingdom, the parent opposing return must show harm that is "something greater than would normally be expected on taking a child away from one parent and passing him to another." *In re A.*, [1988] F.L.R. 365, 372.

In *Diorinou*, as previously noted, the Second Circuit reviewed the reasoning of a Greek court decision that based an Article 13(b) determination on reasoning similar to that employed by the Greek court in this case. The Greek court had stated that "if the children were forced to leave their mother, there would be grave danger of exposing them to psychological harm and place them in an intolerable situation." 237 F.3d at 144 (internal quotation marks omitted). Although the Second Circuit ultimately extended comity to the Greek court's decision on the strength of its Article 3 determination, our sister circuit emphasized that it was "dubious" about the Greek court's reasoning, noting that Article 13(b) was "to be narrowly construed to preclude return only in extreme circumstances." *Id.* at 145 (citing *Friedrich I*, 73 F.3d at 1068-69).

Here, as in *Diorinou*, the Greek court failed to support its conclusion with evidence that the child, if returned to the United States, would have experienced "something greater than would normally be expected on taking a child away from one parent and passing him to another." *In re A.*, [1988] F.L.R. 365, 372. Although the Greek court opined that the child would suffer more trauma as a result of his young age, allowing an exception to return in cases involving young children wrongfully removed or retained by their mothers would swallow the Convention's rule of return.

**[15]** By basing its analysis largely on matters properly reserved for the courts of the child's habitual residence and by construing Article 13(b)'s grave risk exception so broadly, the Greek court's Article 13(b) determination contravened the intent of the Convention's drafters. As a result, this determination cannot properly support the Greek court's denial of Petroutsas's petition.

## IV.   Conclusion

Although we are reluctant to ignore a foreign court's decision under the Hague Convention, our concern with the Greek court's analysis goes beyond a mere difference of opinion on the proper application of established law to the facts of the case or a different view of the facts in light of the evidence presented. The Greek court's misapplication of key provisions of the Convention and its unreasonable factual findings undermine its decision to deny Petroutsas' petition. Further, key aspects of the decision contravene underlying principles of the Convention, such as the avoidance of the consideration of the merits of custody disputes and the need to draw exceptions to return narrowly. Unlike the Greek court's analysis in *Diorinou*, no ground upon which the Greek court relied here is "entirely supportable" under the Convention. Rather, like the Third Circuit in *Carrascosa*, we believe that the Greek court's decision departed from the fundamental premises of the Hague Convention, both its underlying goal of returning

children to their habitual residence and its spirit of mutual cooperation and trust among contracting nations.

[16] Because we conclude that the Greek court's failure to comply with the Hague Convention was so egregious, we hold that, even reviewing for abuse of discretion, the district court erred in extending comity to the Greek court's denial of Petroutsas' petition and to the specific grounds underlying that denial. As the district court declined to conduct its own analysis of the merits of Asvesta's Hague petition, specifically the habitual residence determination, we remand the matter to the district court so that it may do so.

REVERSED and REMANDED.

**APPENDIX**
*Asvesta v. Petroutsas* **No. 08-15365**

ΕΠΙΣΗΜΗ ΜΕΤΑΦΡΑΣΗ    TRADUCTION OFFICIELLE    OFFICIAL TRANSLATION

No  133260 - 1/1

PIRAEUS ONE-MEMBER COURT OF FIRST INSTANCE
(Court Seal - stamp)

Order No. 5042/2006

THE PIRAEUS ONE-MEMBER COURT OF FIRST INSTANCE

(SECURITY MEASURES PROCEEDINGS)

Composed of the Hon. Asimina Yfanti, Presiding Court of First Instance Judge, who was appointed by draw according to the provisions of Act 3327/2005.

Held a public session in its courtroom on 23 March, 2006, without the collaboration of a court clerk, in order to decide the case between:

THE PETITIONER: The Greek State (Ministry of Justice), legally represented by the Minister of Justice, which is acting on account of Mr. George Anthony Petroutsas, a resident of Capitola, California, USA, according to article 1, par. 2, Act 2102/92, which was represented in the courtroom by Mr. Anastasios Rallis, authorized Judicial Representative of the Legal Council of State.

THE RESPONDENT TO THE PETITION: Despina Asvesta Petroutsas, a resident of Nikea, Piraeus, Greece, who appeared in court with her authorized attorneys Christos Panoussis and Joseph Paraschos.

Μεταφραστική Υπηρεσία Υπουργείου Εξωτερικών, Αθήνα

Service des Traductions du Ministere des Affaires Etrangeres de la Republique Hellenique, Athenes

Hellenic Republic, Ministry of Foreign Affairs, Translation Service, Athens.

ASVESTA v. PETROUTSAS
CASE NO.: C-07-05535JF
PETITIONER'S EXHIBIT
7
345

ΕΠΙΣΗΜΗ ΜΕΤΑΦΡΑΣΗ    TRADUCTION OFFICIELLE    OFFICIAL TRANSLATION

No  133260 - 1/1

The petitioner requested that its petition of 20 February, 2006 and deposition report no. 1957/23-2-2006, which was filed at this Court Office and the hearing of which was set for the initially mentioned court date, be granted.

During the hearing of the case the authorized attorneys for the litigants pleaded their cases and requested that they be granted.

Having heard the authorized attorneys for the litigants

THE COURT STUDIED THE BRIEF

AND DECIDED ACCORDING TO THE LAW

In the petition under judgment the petitioning Greek State, which is acting on account of Mr. George Petroutsas, a resident of the USA, reports that the latter, his wife (the respondent) and their minor child were living in California, USA until 8 November, 2005, when the respondent with their minor child visited Greece, that since then the respondent has been illegally detaining the minor in Greece, while she had to have returned on 1 December, 2005 and that the litigants have in common the custody and parental care of the minor. While its requests that the respondent is forced to deliver the child to his father, in order for his to take him back to the place of his permanent residence in California, USA, that a fine and imprisonment be threatened against the respondent in

Μεταφραστική Υπηρεσία Υπουργείου Εξωτερικών, Αθήνα

Service des Traductions du Ministere des Affaires Etrangeres de la Republique Hellenique, Athenes

Hellenic Republic, Ministry of Foreign Affairs, Translation Service, Athens.

ΕΠΙΣΗΜΗ ΜΕΤΑΦΡΑΣΗ      TRADUCTION OFFICIELLE      OFFICIAL TRANSLATION

No   133260 - 1/1

the case she does not comply and that this order be declared provisionally enforceable. The petition is admissibly brought for a hearing before this Court, which is the subject-matter and territorially competent Court to judge according to the security measures proceedings (Greek Code of Civil Procedure article 686) and it is legal, grounded on the provisions of articles 1, 2, 3, 4, 5, 6, 8, 9, 10, 11, 12 of the International Convention for the civil issues of international abduction of children, which was signed in the Hague on 25 October, 1980 and was ratified by Act 2102/1992, as well as on the provision of Greek Code of Civil Procedure article 950 no. 1, except for the request this order to be declared provisionally enforceable, which is non legal and dismissible, since the security measures order is immediately enforceable. Therefore the petition must be furthermore investigated even from its substantive aspect.

From the sworn testimonies of the witness for the litigants, Mr. Dionysios Heliotis and Mrs. Maria Asvesta, who were examined in the courtroom, the no. 5525, 5526, 5527 and 5528/22-3-2006 affidavits before the Athens Justice of the Peace, which were given following a subpoena of the petitioner (refer to the no. 10155b/16-3-2006 legal instrument service report of Mr. Evangelos Zervos, Process Server at the Athens

Μεταφραστική Υπηρεσία Υπουργείου Εξωτερικών, Αθήνα

Service des Traductions du Ministere des Affaires Etrangeres de la Republique Hellenique, Athenes

Hellenic Republic, Ministry of Foreign Affairs; Translation Service, Athens.

347

ΕΠΙΣΗΜΗ ΜΕΤΑΦΡΑΣΗ          TRADUCTION OFFICIELLE          OFFICIAL TRANSLATION

No   133260 - 1/1

Court of First Instance) and granted that affidavits are allowed in the security measures proceedings even without a prior subpoena of the petitioner (refer to Parm. Tzifras, Security Measures, page 53), as well as even from the documents which the litigants are producing, the following were speculated: George Petroutsas, who has the Greek and American citizenship, and the respondent, who has the Greek citizenship, were united in civil marriage on 10 March, 2002 in Watsonville, Santa Cruz County, California, USA, which was solemnized according to the Greek Orthodox Denomination in the Isle of Zakynthos, Greece on 30 August, 2003. From this marriage they have a son, ▆▆▆▆▆▆▆▆▆▆▆ who was born on 21 May, 2005 in Santa Cruz, California. The ordinary residence of the spouses and their child was the city of Capitola, California, where the spouses had settled since January 2003. George Petroutsas was reassuring the respondent that there stay in the USA was temporary and that soon they would go back to Greece for permanent settlement. Since the profession of real estate broker that George Petroutsas was practising yielded a very low income which was not enough to deal with his and the respondent's livelihood needs, the respondent sought employment and was temporarily hired, under a fixed term contract, as a Greek teacher at the Defence

Μεταφραστική Υπηρεσία Υπουργείου Εξωτερικών, Αθήνα

Service des Traductions du Ministere des Affaires Etrangeres de la Republique Hellenique, Athenes

Hellenic Republic, Ministry of Foreign Affairs, Translation Service, Athens.

ΕΠΙΣΗΜΗ ΜΕΤΑΦΡΑΣΗ     TRADUCTION OFFICIELLE        OFFICIAL TRANSLATION

No     133260 – 1/1

Department. From the year 2004 the conduct of George Petroutsas towards the respondent began to change, he became violent, he was making scenes, he was talking bad to her, he was swearing at her and insulting her before third parties and was inexcusably absent from their house. Even after the birth of their child George Petroutsas was indifferent to his conjugal and family obligations and was making bad scenes before the eyes of the minor.

From September 2005 the spouses had no mental communication and physical contact and the respondent was communicating by e-mail with her husband, because the latter refused to talk to her. On 2 November, 2005 George Petroutsas through e-mail mentioned to the respondent, in relation to the prospect of their going back to Greece, that he refuses to live in an apartment with a 2x8 m. balcony, that their house must have a garden, to be just a few meters far from the sea, that he wants to have his own business and that if she (the respondent) does not agree with his terms, then he would be forced to ask for a divorce, while he suggested to the respondent to go to Greece together with their minor child and that he would go there to see him. On 9 November, 2005 the respondent came to Greece together with her minor child, with her husband's consent, who accompanied her to the airport,

Μεταφραστική Υπηρεσία Υπουργείου Εξωτερικών, Αθήνα

Service des Traductions du Ministere des Affaires Etrangeres de la Republique Hellenique, Athenes
Hellenic Republic, Ministry of Foreign Affairs, Translation Service, Athens.

EΠIΣHMH METAΦPAΣH    TRADUCTION OFFICIELLE    OFFICIAL TRANSLATION

No 133260.- 1/1

having already signed a related document, whereby he was giving the respondent permission to travel together with their son during the period of time from 8 November, 2005 to 8 December, 2005. The respondent and her child would return to the USA together with her mother and afterwards her father and brother would come to spend the Christmas holidays together. On 29 November, 2005 George Petroutsas, in a phone call of his to the respondent, mentioned to her that he had already reported her to the American authorities for abduction of minor, he threatened her that she will go to jail and that she will never see the child again. During that period of time the respondent was informed from relatives of hers that her husband, in the summer of 2005 when he was for vacation in Zalynthos, was watching on his computer his secretary Jessie, on the INTERNET, stripping and having sex, while in retrospect she was informed that her husband was having an affair with the above-named since December 2004. The respondent was also informed that from 20 August, 2005 to 22 August, 2005 her husband had sexual intercourse with his ex-girlfriend Sophia Drakogianni at a hotel in Lagonissi, Attica, Greece. Due to the aforementioned conduct of George Petroutsas his relationship with his wife was strongly impaired, so that the continuation of their married cohabitation to be unbearable

Μεταφραστική Υπηρεσία Υπουργείου Εξωτερικών, Αθήνα

Service des Traductions du Ministere des Affaires Etrangeres de la Republique Hellenique, Athenes
Hellenic Republic, Ministry of Foreign Affairs, Translation Service, Athens.

350

ΕΠΙΣΗΜΗ ΜΕΤΑΦΡΑΣΗ        TRADUCTION OFFICIELLE        OFFICIAL TRANSLATION

No    133260 - 1/1

...er. On 30 November, 2005 George Petroutsas, without his wife knowing, filed at the American courts a petition for the dissolution of their marriage and the assignment of their minor child's custody to him, falsely stating 18 November, 2005 as the date of their separation. Following the above the respondent filed at the Athens Multimember Court of First Instance her action of 5 December, 2005, whereby she requests the dissolution of her marriage to her husband and at the Athens One-Member Court of First Instance her petition of 5 December, 2005, whereby she requests that she be temporarily assigned the exercising of the parental care of her minor child. Following a related request of the respondent an injunction was granted on 9 December, 2005, after a telephone subpoena of her husband, whereby the custody of her minor child was temporarily assigned to her and the family house of the respondent at 22 Platonos St., Nikea, Greece was set as the place of his temporary residence, until the hearing of the above petition on 9 January, 2006. On the court date the hearing of the petition was adjourned in implementation of article 16 of the aforementioned International Convention, which sets forth that the judicial authorities of the Contacting State, where the child moved or was detained, cannot judge on the primary issue of the right of custody,

Μεταφραστική Υπηρεσία Υπουργείου Εξωτερικών, Αθήνα        ΙΟ

Service des Traductions du Ministere des Affaires Etrangeres de la Republique Hellenique, Athenes

Hellenic Republic, Ministry of Foreign Affairs, Translation Service, Athens.

ΜΕΤΑΦΡΑΣΗ          TRADUCTION OFFICIELLE          OFFICIAL TRANSLATION

**No**   133260 – 1/1

until it is ascertained that that there in so case of the child coming back. From the total probative evidence that were produced it was proven that the move of minor

and his stay in Greece are not illegal, granted that the child's father George Petroutsas has consented, as previously reported, to his move and stay in Greece, giving for this purpose to the respondent a related written permission and suggesting to her to stay in Greece together with the minor and he would communicate with him when he visited Greece. It was also proven that George Petroutsas was not virtually exercising the right of custody of the person of the minor at the time of his move, since, as previously reported, he was indifferent to his family obligations, he was not engaged in the minor's care and was indifferent to his psychosomatic development. It was also proven that there is a severe danger that the minor's return to the USA to expose him to mental tribulation, since he will be deprived of his mother's presence, affection, love and care at the delicate age of 12 months, he will be deprived of the security and stability that he feels near his mother and his mental bond with her will be broken. Since the foregoing were proven, this Court is not bound to order the minor's return to the USA. Therefore the petition under judgment must be dismissed as

Μεταφραστική Υπηρεσία Υπουργείου Εξωτερικών, Αθήνα          ʎ𝒪

Service des Traductions du Ministere des Affaires Etrangeres de la Republique Hellenique, Athenes
Hellenic Republic, Ministry of Foreign Affairs, Translation Service, Athens.

352

ΕΠΙΣΗΜΗ ΜΕΤΑΦΡΑΣΗ        TRADUCTION OFFICIELLE        OFFICIAL TRANSLATION

No    133260 – 1/1

substantively ungrounded and George Petroutsas must be forced to pay the respondent's court expenses (Greek Code of Civil Procedure article 176), as these are particularly specified in the enacting clause.

FOR THESE REASONS

Passes a defended judgment.

Dismisses the petition.

Forces George Petroutsas to pay the respondent's court expenses, which it sets at four hundred (400) euros.

Judged, decided and published in Piraeus, Greece, this 24th of March, 2006, in a special public session in its courtroom, the litigants and their attorneys being absent, in the presence of Court Clerk Theofanis Balafoutis.

THE JUDGE                          THE COURT CLERK
(Signature)                        (Signature,
Asimina YFANTI                     Theofanis BALAFOUTIS

True certified copy
seen for having been
duly stamped and issued.
Piraeus, 25 July, 2006
The Court Clerk
(Signature) (Court Seal)
Theofanis Balafoutis

True translation from the
attached certified Greek document.
Date: 31 August, 2006
Translator: Antigone Calantzis Kolovos

Μεταφραστική Υπηρεσία Υπουργείου Εξωτερικών, Αθήνα

Service des Traductions du Ministere des Affaires Etrangeres de la Republique Hellenique, Athenes

Hellenic Republic, Ministry of Foreign Affairs, Translation Service, Athens.