No. 123,535

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of S.L.,
A Minor Child.

SYLLABUS BY THE COURT

1.

The Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11670, 1988 WL 411501 (the 1980 Hague Convention) and the International Child Abduction Remedies Act, 22 U.S.C. § 9001 et seq. (2018), provide for the return of children wrongfully removed or retained from their habitual residence.

2.

The primary purpose of the 1980 Hague Convention is to preserve the status quo custody arrangement of the parties and to deter a parent from crossing international boundaries in search of a more sympathetic court. The 1980 Hague Convention empowers courts to determine only rights under the Convention and not the merits of any underlying child custody claims.

3.

Courts analyzing claims under the 1980 Hague Convention follow a three-step analysis. (1) Did an abduction occur? Article 3 defines abduction as a wrongful transfer or wrongful retention. (2) Does an exception apply? Under Article 13, courts are permitted to refuse to return a child to their habitual residence if certain narrowly construed exceptions apply. (3) If a court properly invokes an Article 13 exception, what is the effect on jurisdiction and custody? In this third step, courts in the child's habitual residence analyze the foreign court's decision, applying principles of comity.

1

4.

To show that an abduction occurred under Article 3 of the 1980 Hague Convention a petitioner must show that there was a wrongful transfer or a wrongful retention. A wrongful transfer occurs when one parent removes the child to another country in breach of the other parent's lawful custody rights. A wrongful retention occurs when a parent exercising lawful custody rights authorizes the child's transfer to another country, but then the child is retained in that country in breach of the parent's custody rights.

5.

If a petitioner shows a wrongful transfer or wrongful retention, the burden shifts to the respondent to show that an Article 13 exception under the 1980 Hague Convention applies allowing courts to refuse to return the child. Courts may order a child returned to their habitual residence even if Article 13 exceptions apply because the language of Article 13 is permissive and courts are not required to invoke an exception.

6.

The exceptions to the 1980 Hague Convention are intended to be construed and applied very narrowly to effectuate the objectives of the 1980 Hague Convention.

7.

Although the surroundings to which the child will be returned and the personal qualities of the people located there are relevant to the inquiry of whether the child will be exposed to a grave risk of harm, the Article 13(b) exception under the 1980 Hague Convention was not intended to be used as a vehicle to litigate the child's best interests. The person opposing the child's return must show the risk to the child is grave and not merely serious.

8.

Courts apply principles of comity to decide whether to defer when a foreign court invokes an Article 13 exception under the 1980 Hague Convention and refuses to return a child. Under Article 16, when a foreign court correctly interprets the 1980 Hague Convention and decides not to return the child, then that court may decide on the merits of rights of custody.

Appeal from Johnson District Court; CHRISTINA DUNN GYLLENBORG, judge. Opinion filed November 12, 2021. Reversed in part, vacated in part, and remanded with directions.

*Valerie L. Moore* and *Amy Vinton*, of Lenexa, for appellants A.L. and M.W.

*Ronald W. Nelson* and *Ashlyn L. Yarnell*, of Ronald W. Nelson, PA, of Overland Park, for appellees E.L. and J.H.

Before GREEN, P.J., CLINE, J., and BURGESS, S.J.

GREEN, J.: S.L. is a minor with dual citizenship in the Netherlands and the United States. S.L. lived with E.L. (Father) and J.H. (Stepmother) until March 2019, when Father sent S.L. to stay with his sister A.L. (Aunt) and her partner M.W. (Uncle) for spring break. Aunt and Uncle filed accusations of child abuse with a child protective service in the Netherlands. A Dutch court suspended Father and Stepmother's parental rights. The Dutch court took S.L. into foster care, assigning residential placement with Aunt and Uncle. Father and Stepmother filed a "Petition for Issuance of Child Abduction Prevention Measures Under the Uniform Child Abduction [Prevention] Act (UCAPA)" in Johnson County, Kansas. The trial court determined that it had jurisdiction over S.L. and ordered her returned to Father and Stepmother in Kansas. Aunt and Uncle appeal, arguing that the trial court lacked subject matter and personal jurisdiction. Alternatively, Aunt and Uncle argue that the trial court erred in ordering S.L. returned to Kansas. Because the Dutch courts properly refused to return S.L. to Kansas, we reverse the decision of the

3

Johnson County District Court, vacate the district court orders, and remand with directions that the district court give comity to the Hague Court of Appeals' decision.

FACTS

S.L. was born in New York, New York, in July 2006. S.L.'s mother died in September 2008 in New York, New York. Father married Stepmother in December 2008. Then, S.L., Father, and Stepmother lived in Groenlo, Netherlands, for slightly more than a year and a half, from December 2008 to July 2010.

In May 2011, the District Court of Amsterdam granted parental authority to Stepmother, assigning joint parental authority to her and Father. From August 2013 until March 2019, S.L. lived with Father and Stepmother at the following locations:

- August 2013–July 2015:  Overland Park, Kansas
- August 2015–April 2016:  New York, New York
- (Lived with paternal grandparents May 2016–August 2016:  Groenlo, Netherlands)
- August 2016–July 2017:  Overland Park, Kansas
- August 2017–August 2018:  New York, New York
- September 2018–March 2019:  Orlando, Florida

In February 2019, S.L., Father, and Stepmother were living in Orlando, Florida, and S.L. was enrolled at Southwest Middle School in Orange County, Florida. In March 2019, S.L. went to the Netherlands to spend her school spring break with Aunt and Uncle. S.L. arrived in Amsterdam on March 14, 2019, with a return ticket for March 28, 2019.

4

The day after S.L. arrived in the Netherlands, March 15, 2019, Stepmother gave Aunt and Uncle a power of attorney to make practical decisions about S.L. during her stay in the Netherlands. That power of attorney expired on August 31, 2019, and was not renewed or extended. But Father and Stepmother spoke with Aunt and Uncle sometime during S.L.'s stay and they agreed that S.L. would not return on the date planned. Instead, she would stay in the Netherlands as late as the end of July so that she could start the new school year in August 2019.

Aunt and Uncle registered S.L. at their address on April 30, 2019, and enrolled S.L. in school in the Netherlands. Aunt and Uncle filed accusations with the Council for Child Protective Services in Arnhem, the Netherlands (Council), accusing Father and Stepmother of child abuse, neglect, and abandonment. On June 13, 2019, the Council petitioned the Gelderland District Court to place S.L. under supervision. After a contested hearing on July 5, 2019, the children's judge authorized Child Protection Gelderland (Child Protection) to supervise S.L. from July 5, 2019, to July 5, 2020. Child Protection then assigned custodial placement of S.L. to Aunt and Uncle. Father and Stepmother appealed the order from the Gelderland District Court to the Arnhem-Leeuwarden Court of Appeals.

On November 6, 2019, Father and Stepmother also filed a petition with the Court of the Hague for the return of S.L. under the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11670, 1988 WL 411501 (the 1980 Hague Convention). This filing added a second track of litigation, parallel to the proceedings which began in the Gelderland District Court.

On December 5, 2019, the Arnhem-Leeuwarden Court of Appeals issued its decision reversing the Gelderland District Court's order placing S.L. with Child Protection. The appellate court ruled that the lower Dutch court did not have jurisdiction to consider the Council's request to place S.L. with Child Protection. The appellate court

also ruled that the United States was S.L.'s "habitual residence" under applicable European Union law, Brussels II-bis. And the appellate court ruled that Dutch law did not give the lower court jurisdiction because S.L.'s usual residence was the United States and no exceptions existed to invoke jurisdiction. In short, the appellate court held that the lower court did not have jurisdiction under international treaty, European Union law, or Dutch law. Thus, the appellate court "destroy[ed] the court order of the children's judge at the court in Gelderland." As a result, the Council's supervision of S.L. ended on December 5, 2019.

Immediately, Stepmother flew to the Netherlands to retrieve S.L., with an airplane ticket for S.L. to make the return trip. Stepmother spent December 10, 2019, helping S.L. to pack her belongings. The family had a farewell party for S.L. that night.

But on December 9, 2019, the Council filed a request with the Gelderland District Court for the provisional supervision and authorization for out-of-home placement of S.L. Ruling from the bench, the Gelderland District Court declared it lacked jurisdiction to hear the Council's request, in keeping with the appellate court decision from just days earlier on December 5, 2019.

The next day, December 10, 2019, the Council again requested that the district court temporarily place S.L. under supervision and allow Child Protection to decide residential placement. The Council added as a new basis for its request that Stepmother intended to take S.L. back to the United States against her will on December 11, 2019, without safety guarantees or a child protection plan. This time, the Gelderland District Court granted Child Protection supervision, authorizing residential placement of S.L. S.L. did not return to the United States with Stepmother.

On December 20, 2019, Stepmother requested two temporary protection from abuse orders in Johnson County, Kansas, on behalf of S.L. The trial court granted the

petitions, issuing one order that Uncle was to have no contact with S.L. and another order prohibiting Aunt from having contact with S.L. At the time, S.L. was living with Aunt and Uncle in the Netherlands and the record does not make clear if the Johnson County protection from abuse orders had any practical effect. On one order, the trial court determined that it had child custody jurisdiction because Kansas is the home state. On the other order, the trial court was silent on the jurisdiction issue.

On January 6, 2020, the Gelderland District Court upheld its order from December 10, 2019, which placed S.L. in foster care.

On January 30, 2020, the Court of the Hague denied Father and Stepmother's request to return S.L. to the United States. The Court of the Hague confined itself to the narrow question of whether S.L. had been abducted within the meaning of Article 3 of the 1980 Hague Convention. Under Article 3, an abduction occurs when there is either an unauthorized transfer or an unauthorized detention. The court easily concluded that there was no unauthorized transfer of S.L. because Father and Stepmother sent her to the Netherlands and agreed to the trip. The court then determined that Child Protection's supervision of S.L. was not an unauthorized detention because Child Protection acted under court order. The only period during which Child Protection was not authorized to detain S.L. by court order was from December 5, 2019, to December 10, 2019. The Court of the Hague determined that S.L. was not in fact detained at all during that time but was available to fly back to the United States with Stepmother and nearly did.

And the Court of the Hague ruled that the December 10, 2019 Gelderland District Court order did not conflict with the temporary protection from abuse orders from the Johnson County District Court entered on December 23, 2019. The Court of the Hague determined that the orders did not cover the same ground because the protection of abuse orders did not determine custody:

7

"[T]he court order of the US court in Kansas is not aimed at taking child protection measures for [S.L.] in America. This order does not share the same idea as where the [temporary] supervision and custodial placement is aimed at, namely to protect [S.L.] in connection with a serious threat to her development."

After the Court of the Hague ruled that there had been no abduction under Article 3 of the 1980 Hague Convention, it addressed residential placement of S.L. and child protection measures. The Court of the Hague "consider[ed] that not this court, but the court in Gelderland or the Courthouse of Arnhem-Leeuwarden has the authority to decide on the parents' requests." Father and Stepmother appealed.

But also, on February 10, 2020, Father and Stepmother filed the petition at issue in this case. Their "Petition for Issuance of Child Abduction Prevention Measures Under the Uniform Child Abduction [Prevention] Act (UCAPA)" requested that the Johnson County District Court issue a warrant to take immediate physical custody of S.L. Father and Stepmother then moved for ex parte temporary orders the next day, February 11, 2020. On February 13, 2020, the Johnson County District Court issued ex parte temporary orders, ordering Aunt and Uncle to immediately return S.L. to Father and Stepmother.

On February 20, 2020, the Council added a fourth layer of litigation. At this point, the Gelderland District Court's decision to place S.L. in foster care was then on appeal. Second, the Court of the Hague's decision that the 1980 Hague Convention did not apply to S.L. was on appeal. Third, the Johnson County District Court had yet to decide if S.L. had been abducted under UCAPA, although it had issued temporary ex parte orders. And fourth, on February 20, 2020, the Council petitioned the Gelderland District Court to end or suspend Father and Stepmother's custody of S.L.

On March 5, 2020, the Arnhem-Leeuwarden Court of Appeals upheld the Gelderland District Court's order of December 10, 2019, which placed S.L. with Child Protection. The Arnhem-Leeuwarden Court of Appeals, however, upheld the Gelderland District Court as right for the wrong reasons. The Arnhem-Leeuwarden Court of Appeals noted that the lower court had derived its jurisdiction from European Union law, namely Article 20 of Brussels II-bis. The Arnhem-Leeuwarden Court of Appeals disagreed, pointing out that it had just stated on December 5, 2019, that Brussels II-bis could not provide jurisdiction because S.L.'s habitual residence was the United States. Thus, it would be difficult to arrive at a different conclusion when the Council made a new request for supervision on December 10, 2019. The Arnhem-Leeuwarden Court of Appeals stated the following:

> "Another complicating factor in the assessment of the jurisdiction question is that the duration of [S.L.'s] stay in the Netherlands on reference date December 10, 2019 is partly based on an—as it turned out—unauthorized decision of the juvenile court. The question whether [S.L.] had her habitual residence in the Netherlands (or in the United States of America) on December 10, 2019 is therefore not easy to answer in the opinion of the court."

But the Arnhem-Leeuwarden Court of Appeals ruled that the decision of habitual residence could remain undecided because the Dutch courts could derive their jurisdiction from the Hague Convention on Jurisdiction, Applicable Law, Recognition, Enforcement and Co-operation in Respect of Parental Responsibility and Measures for the Protection of Children, Oct. 19, 1996, 35 I.L.M. 1391 (1996 Hague Convention). "In all cases of urgency, the authorities of any Contracting State in whose territory the child or property belonging to the child is present have jurisdiction to take any necessary measures of protection." 1996 Hague Convention, 35 I.L.M. 1391, art. 11(1). The Arnhem-Leeuwarden Court of Appeals ruled that the Dutch courts had jurisdiction to take necessary measures of protection because S.L. was present in the contracting state of the Netherlands and the measures in question were urgent.

9

The Arnhem-Leeuwarden Court of Appeals agreed with the Gelderland District Court that the matter was urgent on December 10, 2019, because Stepmother intended to take S.L. back to the United States immediately. The appellate court echoed the Council's concerns for S.L. if Stepmother took her back to the United States, relying heavily on S.L.'s own statements. S.L. told the Council that there was arguing at home, "that she feels that she must do everything to please the stepmother, that she has moved many times, that the stepmother strikes her and that she wants to stay in the Netherlands and wants peace." Father confirmed S.L.'s account, stating "that the family has moved often, that there are always a lot of arguments at home, that domestic violence has taken place between the father and the stepmother, that the stepmother takes out her emotions on [S.L.] and that the stepmother [strikes S.L.] and yells at her." Aunt and Uncle also confirmed that there were "many problems between the father and the stepmother, that the stepmother always criticizes [S.L.] and that she does not hesitate to use physical violence." Based on those statements, the Council had serious concerns about S.L.'s basic care and safety with Father and Stepmother. Those concerns, combined with Stepmother's plan to take S.L. back to the United States on December 11, 2019, led the appellate court to conclude that the case was urgent on December 10, 2019, under Article 11(1) of the 1996 Hague Convention.

The Arnhem-Leeuwarden Court of Appeals ruled that Article 11(1) granted jurisdiction of the Dutch courts over the case. Article 15(1) addresses which law the Dutch courts would apply to the case: "In exercising their jurisdiction under the provisions of Chapter II, the authorities of the Contracting States shall apply their own law." 1996 Hague Convention, 35 I.L.M. 1391, art. 15(1). The Arnhem-Leeuwarden Court of Appeals determined that the applicable Dutch law was Article 1:257 of the Dutch Civil Code, stating that there is no appeal from decisions based on Article 1:257. The court then declared Father and Stepmother "inadmissible," essentially dismissing the appeal by its order of March 5, 2020.

10

On March 9, 2020, the Gelderland District Court granted the Council's February 20, 2020 request to suspend the custody of Father and Stepmother and assigned provisional guardianship to Child Protection. In doing so, the court ruled that it had jurisdiction under the 1996 Hague Convention, just as the appellate court had said days earlier, on March 5, 2020. The Gelderland District Court then assessed if it could suspend Father and Stepmother's custody of S.L. under Article 1:268 of the Dutch Civil Code, given the facts before it:

"At least since the summer of 2019, [S.L.] has repeatedly indicated to various people and agencies that she does not want to return to her father and stepmother because she fears for her emotional and physical safety. . . . [S.L.] reaffirmed that she does not want to return to a parenting situation where the stepmother abuses her and her father is unable to protect her. . . . In addition, the father and stepmother are unable, in collaboration with agencies such as the [Council] and [Child Protection], to provide information about [S.L.]'s parenting situation in America. They take the position that [S.L.] should return immediately and have no regard for her signals and feelings of insecurity and their role in it. In fact, they assign the cause of these signals to [S.L.] and the family where she is currently staying. They are also very negative about [S.L.]'s late mother and the maternal family, putting a burden on [S.L.]'s development of identity. The father and stepmother are now so strongly opposed to [S.L.]'s stay with family in the Netherlands that they cannot even restore (emotionally) safe contact with [S.L.] through Facetime, for example."

The Gelderland District Court made the following custody determination, stating:

"The court considers that it is necessary in the interest of [S.L.] to suspend the custody of the father and stepmother and to charge [Child Protection] with provisional guardianship. The custody decisions necessary for [S.L.], such as enrollment at school, can then be taken with due haste. And this prevents the—not inconceivable—situation that [S.L.] will be picked up from the foster parents by her father and stepmother, without any form of guidance and guarantee of assistance in the United States. Although the father and stepmother may have submitted a plan in case [S.L.] returns to them, this plan

11

does not confirm the feasibility and involvement of child protection (agencies) in the United States with this plan. In the judgment of the court, this plan therefore offers insufficient guarantees for a responsible return of [S.L.]. When [S.L.] must return to the father and stepmother, [S.L.] must do so safely, under the guidance of professional care providers. The concerns expressed by [S.L.] about the period in which she lived with her father and stepmother have not subsided, especially now that the relationship between [S.L.] and her father and stepmother has deteriorated sharply in recent months. The court is of the opinion that in order to realize any return in a responsible manner, it is necessary that [Child Protection] will supervise this return, preferably in collaboration with care providers in the United States."

Thus, the Gelderland District Court temporarily suspended parental custody rights over S.L. The court would not make a final decision while the Court of the Hague's decision on the 1980 Hague Convention was still pending on appeal.

On March 20, 2020, Aunt and Uncle moved to dismiss in Johnson County, Kansas, alleging various deficiencies in Father and Stepmother's UCAPA petition.

On March 25, 2020, the Hague Court of Appeals affirmed the decision of the Court of the Hague to not return S.L. to Father and Stepmother in the United States. The Hague Court of Appeals upheld the lower court's decision as right for the wrong reasons. The heart of the Court of the Hague's ruling was that there was no unauthorized detention under Article 3 of the 1980 Hague Convention because a court order authorized Child Protection to supervise S.L. The Hague Court of Appeals disagreed, holding that temporary protective measures would not end parental custody rights:

"The circumstance that in the interim by provisional ruling custody measures have been taken, in the form of placement under supervision and an authorization for custodial placement, and the circumstance that finally the custody of the parents over the minor was recently suspended, do not, in the opinion of the court, give grounds for the judgment that the withholding cannot be or is no longer in breach of the custody rights of the

parents as described in article 3 section 1, opening lines and sub a [of the 1980 Hague Convention]. The aforementioned provisional protective measures and the provisional custody are, after all, by nature emergency measures that temporarily limited, respectively suspended, the parental authority of the parents. However, this does not negate the fact that the custody rights currently still lie with [both the] parents—until the competent legal authorities in substance rule otherwise in a main proceeding. In addition, pursuant [to] article 17 [of the 1980 Hague Convention], the sole fact that a provisional decision with regards to the custody was made in the Netherlands cannot be the bases for a refusal of returning the child pursuant [to] the [1980 Hague Convention]."

The Hague Court of Appeals held that S.L.'s residence is the United States, Father and Stepmother had custody, and Father and Stepmother did not give permission for Child Protection to keep S.L. in the Netherlands. Thus, S.L.'s stay in the Netherlands is an unauthorized detention under Article 3 of the 1980 Hague Convention. As a result, the court concluded "that non-facilitation of return of the minor is unlawful in the meaning of article 3 section 1 [of the 1980 Hague Convention], which would be, after all, in conflict with the decision of the authoritative parents that the minor should have been returned to the US."

Nevertheless, the Hague Court of Appeals did not order the return of S.L. to her parents. Having found a breach of custody rights under Article 3 of the 1980 Hague Convention, the court determined that "the immediate return of the minor to the US should follow in principle, unless there are one or more grounds for refusal in the meaning of article 13 of the [1980 Hague Convention]." The court then cited such grounds under Article 13 for refusing to return the minor.

The Hague Court of Appeals reviewed the record, including the proceedings in the Gelderland District Court and Arnhem-Leeuwarden Court of Appeals, the report of a court-appointed guardian, and a report prepared by the Council, before concluding that "serious concern exists regarding the physical and the emotional safety of the minor at

the parents' home." The court pointed to the record of family discord and physical abuse before invoking this exception. Further, under Article 13 of the 1980 Hague Convention, a judicial authority may also refuse to order the return of the child if it determines that the child resists return and has reached an age and degree of maturity that justifies taking her opinion into account. The court then cited evidence that S.L. strongly resists return to the United States, including the guardian's statement that S.L. was "very scared, sad and confused" at the thought of having to return to her parents. The court then ruled that S.L. possessed the degree of maturity for the court to take account of her views under Article 13 of the 1980 Hague Convention. Thus, the Hague Court of Appeals affirmed the Court of the Hague's refusal to return S.L. to the United States.

On May 18, 2020, the Gelderland District Court issued its first follow-up order after having suspended Father and Stepmother's parental rights on March 9, 2020. The court pointed to the recent Hague Court of Appeals decision, which cited Article 13 of the 1980 Hague Convention for its refusal to return S.L. to the United States. The court also noted that it had to wait for that Hague Court of Appeals decision because a Netherlands family court could not decide the underlying custody dispute until after the Hague court had decided not to return the child. Also, the Arnhem-Leeuwarden Court of Appeals had already determined that it had the authority to not return S.L. by invoking Article 11(1) of the 1996 Hague Convention in its order of March 5, 2020. Now, the Gelderland District Court revisited the issue of its jurisdiction over S.L.'s case.

The Gelderland District Court determined that S.L.'s habitual residence was the Netherlands. The court considered the length of time S.L. had been in the Netherlands, her wish to continue living with her extended family and her cousin, who is approximately the same age, and her education at a school in the Netherlands. The court compared these factors with the lack of attachment and stability S.L. felt toward her Father and Stepmother. The court concluded that it had jurisdiction under Article 8 Brussels II-bis because S.L.'s habitual residence was the Netherlands. But the Gelderland

14

District Court did not make a final determination on Father and Stepmother's parental rights, instead ordering the parties to submit additional evidence.

On July 30, 2020, the Johnson County District Court denied Aunt and Uncle's motion to dismiss and motion to set aside the ex parte temporary orders. The district court reasoned that

> "the right to file an action for child custody under the UCCJEA [Uniform Child Custody Jurisdiction and Enforcement Act] or under UCAPA isn't tied to a parent having legal custody and isn't nullified by a suspension of parental rights in child protection proceedings. . . . Instead, the clear focus of the UCCJEA and UCAPA is to allow the assertion of child custody jurisdiction by 'a parent or person acting as a parent.'"

The court ruled that Kansas had child custody jurisdiction under three provisions of K.S.A. 2020 Supp. 23-37,201: (1) significant connection jurisdiction, (2) more appropriate forum jurisdiction, and (3) vacuum jurisdiction. The district court further held that "a refusal to return a child on a finding of 'grave risk' under the [1980] Hague Abduction Convention does not deprive a court having appropriate jurisdiction from asserting child custody jurisdiction or itself ordering a return." Thus, the court held that it had jurisdiction. Aunt and Uncle moved the court to alter or amend its judgment.

On August 27, 2020, the Gelderland District Court denied Father and Stepmother's petition for provisional access and restoring contact with S.L. by telephone or video conferencing. The court held that under Dutch law a child is entitled to interact with her parents and with those who have a close personal relationship with her. The court denies this interaction only if: (1) the interaction would seriously harm the child's mental or physical development, (2) the parent or person who has a close personal relationship with the child is manifestly unfit or must be considered manifestly unable to interact, (3) the child aged 12 years or older has expressed serious objections to interacting with her (in this case, S.L.'s) parent or with those with whom she has a close personal relationship, or

15

(4) the interaction is otherwise contrary to the child's overriding interests. The court then found that contact with Father and Stepmother has made S.L. feel unsafe, sad, and unpleasant. The court also quoted disapprovingly from a letter, which Stepmother wrote to S.L. as "not the way to get closer to" S.L. The court stated that no one benefitted from Stepmother's following statements to S.L.:

"So I need you to fully understand that you will never, ever find peace in your life as long as you refuse to negotiate an arrangement to come home, because no matter how much you tell people you want to stay there, we will continue to fight against you to bring you home, because we feel that we know what is best for you as your parents."

The Gelderland District Court ruled that contact between S.L. and her parents was not in S.L.'s best interests, primarily because her parents had shown that they could not interact with S.L. without pressuring her. In making its decision, the court affirmed its previous decision that it had jurisdiction because S.L.'s habitual residence was the Netherlands.

On September 15, 2020, the Johnson County District Court granted Aunt and Uncle's motion to alter or amend. The court reviewed the decisions of the Gelderland District Court in which that court declared its jurisdiction. The Johnson County District Court understood that Father and Stepmother were appealing the Dutch court's decision and directed counsel to provide updates on that appeal.

On October 15, 2020, the Johnson County District Court denied Aunt and Uncle's motion to dismiss. The court held that it had exclusive jurisdiction under the UCCJEA to determine child custody. The court ordered the return of S.L. to Father and Stepmother in the United States.

16

On October 20, 2020, the Gelderland District Court terminated the custody of Father and Stepmother. In doing so, the court concluded:

> "The court concludes that [S.L.] has been experiencing insecurity and uncertainty in her life for a long time and that it is particularly important for [S.L.] that she has peace of mind to be able to develop adequately. A lighter measure, such as the family supervision order, is not appropriate, because it is not possible to work on a return of [S.L.] to the situation with her father and stepmother in the US. This is also due to the fact that the father and stepmother are unable to cooperate with [Child Protection] and to act reliably in this."

On November 10, 2020, the Johnson County District Court denied Aunt and Uncle's second motion to dismiss. The court reaffirmed its child custody jurisdiction under the UCCJEA and confirmed that the United States is S.L.'s habitual residence. It also ruled that the most recent order of the Gelderland District Court did not change any of its rationale or holdings on jurisdiction. The Johnson County District Court further ruled that the Dutch court's termination of Father and Stepmother's custody could not justify dismissal because the Dutch court acted without jurisdiction.

On November 19, 2020, the Johnson County District Court ordered the return of S.L. to her Father and Stepmother.

Aunt and Uncle timely appeal.

ANALYSIS

*Did the Hague Court of Appeals follow the 1980 Hague Convention when it refused to return S.L. to the United States?*

Aunt and Uncle argue that the Johnson County District Court erred by disregarding the most recent determinations of the Dutch courts. Father and Stepmother

17

argue that the later decisions of the Dutch district courts were at odds with the earlier appellate court rulings and should be ignored. But the Gelderland District Court's determination that it has jurisdiction follows from the Hague Court of Appeals' decision not to return S.L. under the 1980 Hague Convention. Because the recent Dutch court orders correctly make a final custody determination, we reverse the Johnson County District Court decision.

The Dutch orders at issue are based on the 1980 Hague Convention. The Ninth Circuit Court of Appeals had this to say about the 1980 Hague Convention:

"Adopted in 1980, the Hague Convention on the Civil Aspects of International Child Abduction is intended to prevent 'the use of force to establish artificial jurisdictional links on an international level, with a view to obtaining custody of a child.' Despite the image conjured by words like 'abduction' and 'force,' the Convention was not drafted in response to any concern about violent kidnappings by strangers. It was aimed, rather, at the 'unilateral removal or retention of children by parents, guardians or close family members.' . . . The preamble to the Convention describes the signatory states as '[d]esiring to protect children internationally from the harmful effects of their wrongful removal or retention,' effects which are thought to follow when a child 'is taken out of the family and social environment in which its life has developed.' [Citations omitted.]" *Mozes v. Mozes*, 239 F.3d 1067, 1069-70 (9th Cir. 2001), *abrogated on other grounds by Monasky v. Taglieri*, 589 U.S. __, 140 S. Ct. 719, 206 L. Ed. 2d 9 (2020).

Congress implemented the Convention in the United States by enacting the International Child Abduction Remedies Act (ICARA) in 1988. 22 U.S.C. §§ 9001 et seq. (2018); *Sampson v. Sampson*, 267 Kan. 175, 176, 975 P.2d 1211 (1999).

The primary purposes of the 1980 Hague Convention include (1) preserving the preabduction status quo of custody arrangements of the parties, and (2) deterring a parent from crossing international boundaries in search of a more sympathetic court. *Lops v. Lops*, 140 F.3d 927, 936 (11th Cir. 1998); *Friedrich v. Friedrich*, 78 F.3d 1060, 1063-64

18

(6th Cir. 1996). Under the 1980 Hague Convention, "when a child who was habitually residing in one signatory state is wrongfully removed to, or retained in, another, Article 12 [of the Convention] provides that the latter state 'shall order the return of the child forthwith.'" *Mozes*, 239 F.3d at 1070. A wrongful transfer occurs when one parent removes the child to another country in breach of the other parent's lawful custody rights. *Sampson*, 267 Kan. at 178. A wrongful retention occurs when a parent exercising lawful custody rights authorizes the child's transfer to another country, but then the child is retained in that country in breach of the parent's custody rights. See, e.g., *Mozes*, 239 F.3d at 1070, 1085.

A court in the abducted-to nation has only the authority to determine the merits of the abduction claim, but not the merits of the underlying custody claim. See *Blondin v. Dubois*, 189 F.3d 240, 245 (2d Cir. 1999). The 1980 Hague Convention relies on the principle that the country in which the child is a habitual resident is in the best position to decide upon questions of custody and access. *Croll v. Croll*, 229 F.3d 133, 137 (2d Cir. 2000), *abrogated on other grounds by Abbott v. Abbott*, 560 U.S. 1, 130 S. Ct. 1983, 176 L. Ed. 2d 789 (2010). The *Mozes* court points out the key concept of the 1980 Hague Convention:

> "The key operative concept of the Convention is that of 'wrongful' removal or retention. In order for a removal or retention to trigger a state's obligations under the Convention, it must satisfy the requirements of Article 3:
> "The removal or the retention of a child is to be considered wrongful where—
> a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
> b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention."
> *Mozes*, 239 F.3d at 1070.

"If it is determined the child has been removed from its habitual residence, the petitioner parent must show by a preponderance of the evidence that the removal was wrongful." *Sampson*, 267 Kan. at 179. If the petitioner establishes a wrongful transfer or retention, then the burden shifts to the respondent to show that an exception to the Convention applies. *Dalmasso v. Dalmasso*, 269 Kan. 752, 757, 9 P.3d 551 (2000). One such exception, which appears in an unnumbered paragraph of Article 13 of the Convention, provides as follows:  "The judicial or administrative authority may also refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." 1980 Hague Convention, T.I.A.S. No. 11670, 1988 WL 411501, art. 13; *de Silva v. Pitts*, 481 F.3d 1279, 1286 (10th Cir. 2007).

This exception, often called the age and maturity exception, is further explained by the legislative history of the Convention.

> "Elisa Pérez-Vera served as 'the official Hague Conference reporter for the Convention,' and her explanatory report 'is recognized by the Conference as the official history of and commentary on the Convention and is a source of background on the meaning of the provisions of the Convention.' See Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed. Reg. 10494, 10503 (1986)." *Whallon v. Lynn*, 230 F.3d 450, 455 n.5 (1st Cir. 2000).

The Explanatory Report:  Hague Conference on Private International Law (1980), *available at* https://assets.hcch.net/docs/a5fb103c-2ceb-4d17-87e3-a7528a0d368c.pdf (Pérez-Vera Report) explains the age and maturity exception from Article 13:

> "[T]he Convention also provides that the child's views concerning the essential question of its return or retention *may be conclusive*, provided it has, according to the competent authorities, attained an age and degree of maturity sufficient for its views to be taken into account. In this way, the Convention gives children the possibility of interpreting their

20

own interests. Of course, this provision could prove dangerous if it were applied by means of the direct questioning of young people who may admittedly have a clear grasp of the situation but who may also suffer serious psychological harm if they think they are being forced to choose between two parents. However, such a provision is absolutely necessary given the fact that the Convention applies, *ratione personae*, to all children under the age of sixteen; *the fact must be acknowledged that it would be very difficult to accept that a child of, for example, fifteen years of age, should be returned against its will*. Moreover, as regards this particular point, all efforts to agree on a minimum age at which the views of the child could be taken into account failed, since all the ages suggested seemed artificial, even arbitrary. It seemed best to leave the application of this clause to the discretion of the competent authorities." *de Silva*, 481 F.3d at 1286 (quoting Pérez-Vera Report ¶ 30, p. 433).

Procedurally, federal law provides that state courts and federal courts have "concurrent original jurisdiction of actions arising under the Convention." 22 U.S.C. § 9003(a) (2018). Thus, persuasive authority applying the 1980 Hague Convention comes from both federal and state cases. One such case is *de Silva*, because of the exception invoked.

Petitioner-appellant S.L.V.M. Cyndie de Silva appealed the judgment of the federal district court denying the return of her son, Jonathan, to her custody in Canada. The district court ruled that Jonathan's habitual residence was in Canada but invoked the age and maturity exception to allow him to remain in Oklahoma pending a custody determination. The *de Silva* court noted that the Convention permits the courts of the abducted-to country to refuse to order the return of a child if the child objects and has attained an age and degree of maturity at which it is appropriate to take his (in that case, Jonathan's) views into account. The district court interviewed Jonathan in camera and considered his wish to remain in Oklahoma, expressed without apparent adult indoctrination. The *de Silva* court's ruling on the 1980 Hague Convention also suggested a jurisdiction analysis:

"Given the court's duty to consider Jonathan's best interest and to determine whether he was of sufficient age and maturity to weigh in on this matter, we find no error in the district court's ultimate conclusion that Jonathan should remain in Oklahoma *while Oklahoma courts decide the custody matter*. We hold that, under the unusual circumstances of this case, it is appropriate to refuse repatriation to Canada solely on the basis of Jonathan's desire to stay in Oklahoma." (Emphasis added.) *de Silva*, 481 F.3d at 1288.

The *de Silva* court did not explain how its refusal to return Jonathan to Canada transferred the jurisdiction of his habitual residence, Canada, to the abducted-to state of the United States so that Oklahoma courts could decide custody. Nevertheless, a court in a Hague Convention contracting state usually respects another contracting state's decision unless it clearly misinterprets the 1980 Hague Convention. This type of review was at issue in *Asvesta v. Petroutsas*, 580 F.3d 1000 (9th Cir. 2009).

Despina Asvesta, a Greek citizen, and George Petroutsas, a dual citizen of Greece and the United States, had moved their minor child between the two countries. When the mother kept the child in Greece, the father filed a 1980 Hague Convention petition in Greek courts. After the Greek courts denied the father's petition, he elected the self-help remedy of taking the child from Greece and bringing the child to the United States. Then the mother filed her own 1980 Hague Convention petition with a federal district court in California. That court deferred to the Greek court's earlier decision to keep the child in Greece. The Ninth Circuit Court of Appeals reversed, outlining when comity is appropriate and when it is not.

"The Ontario Court of Appeal in *Pitts v. De Silva*, 2008 ON.C. LEXIS 34 (Jan. 10, 2008), adopted an approach similar to that of *Diorinou* [*v. Mezitis*, 237 F.3d 133 (2d Cir. 2001),] and *Carrascosa* [*v. McGuire*, 520 F.3d 249 (3d Cir. 2008),] in determining whether it should accord deference to the Tenth Circuit's affirmance of a district court's Hague Convention judgment that refused under Article 13 to return a child to Canada. The Ontario court observed that '[t]he combination of comity, on the one hand, and of the

need to preserve the Hague Convention's effectiveness, on the other, calls for courts to avoid interfering, as much as possible, with foreign interpretations of the Convention.' Nonetheless, the court determined that in some instances, deference could be properly withheld if the foreign decision 'evinces a clear misinterpretation of the Hague Convention or fails to meet a minimum standard of reasonableness.' As in *Diorinou* and *Carrascosa*, the Ontario Court of Appeals considered whether the district court, which the Tenth Circuit had affirmed, conducted a proper analysis under Article 13. Concluding that it had, the Ontario court extended deference to the Tenth Circuit's decision. [Citations omitted.]" *Asvesta*, 580 F.3d at 1013.

The *Asvesta* court, however, did not explain how this comity allowed the abducted-to contracting state to gain jurisdiction over the underlying custody dispute.

But the *de Silva* court's decision not to return Jonathan to his habitual residence makes it similar to the Hague Court of Appeals' decision here not to return S.L. to the United States. Here, the Hague Court of Appeals held that S.L. had been wrongfully retained from the country of her habitual residence. But then the appellate court invoked two exceptions.

First, the Hague Court of Appeals invoked Article 13(b) of the 1980 Hague Convention, which United States courts have called the "grave risk of harm exception." See, e.g., *Friedrich*, 78 F.3d at 1068. This exception states that the abducted-to contracting state is not bound to order the child's return if "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." 1980 Hague Convention, T.I.A.S. No. 11670, 1988 WL 411501, art. 13. Significantly, the translated decision of the Hague Court of Appeals, which is included in our appellate record, states that "serious concern exists regarding the physical and the emotional safety of the minor at the parents' home." We note, however, that a "serious concern" about the physical and the emotional safety of a minor in the parents' home may not meet the narrow application of the grave risk exception.

23

Second, the Hague Court of Appeals invoked the age and maturity exception, as did the *de Silva* court. The appellate court heard from S.L. before the hearing on March 12, 2020, at which point S.L. was 13 years old. As of July 2021, she is now 15. The Hague Court of Appeals ruled that S.L. is of the age and maturity that justifies taking her opinion into account, and she has strongly and consistently objected to returning to the United States. The *de Silva* case provides persuasive authority that the Hague Court of Appeals had the authority to invoke the age and maturity exception under Article 13 of the 1980 Hague Convention and refuse to return S.L. to the United States.

*Should this court honor the Dutch court's decision under principles of international comity?*

The question of whether the Hague Court of Appeals could invoke an exception is only the first step. The next step is deciding if that decision was proper such that we should honor the decision or give it deference. Rather than a typical standard of review, we apply the principles of comity.

Ordinarily, an appellate court determines habitual residence under the deferential "clear error" standard. *Monasky*, 140 S. Ct. at 730. That is, if the countries' positions were reversed and we were reviewing the Johnson County District Court's determination of S.L.'s habitual residence under the 1980 Hague Convention, then we would review the decision for clear error.

But here, Father and Stepmother filed their petition under the 1980 Hague Convention in the Netherlands. Thus, we must decide what effect the Dutch courts' resolution of Father and Stepmother's Hague Convention petition had on subject matter jurisdiction. A proper analysis begins by distinguishing between subject matter jurisdiction and the doctrine of international comity.

Subject matter jurisdiction is the legal authority of the court to hear a type of case or dispute. A court must have subject matter jurisdiction to enter a valid judgment. If a court lacks subject matter jurisdiction, its actions have no legal force or effect, and the court's orders are void. *In re Estate of Heiman*, 44 Kan. App. 2d 764, 766, 241 P.3d 161 (2010). Parties cannot confer subject matter jurisdiction by consent, waiver, or estoppel; a failure to object to the court's jurisdiction does not invest the court with the requisite subject matter jurisdiction. *Goldman v. University of Kansas*, 52 Kan. App. 2d 222, 225, 365 P.3d 435 (2015). Courts are obligated to raise and address an apparent lack of subject matter jurisdiction even if the parties have not. Whether jurisdiction exists is a question of law over which this court's scope of review is unlimited. *In re Care & Treatment of Emerson*, 306 Kan. 30, 33-34, 392 P.3d 82 (2017).

"Under comity principles, 'courts of one state give effect to the laws and judicial decisions of another, not as a matter of obligation but out of deference and respect.'" *In re A.A.-F.*, 310 Kan. 125, 139, 444 P.3d 938 (2019) (quoting *Padron v. Lopez*, 289 Kan. 1089, 1108, 220 P.3d 345 [2009]). Comity is "at the heart of the [Hague] Convention." *Diorinou*, 237 F.3d at 142. "The careful and thorough fulfillment of our treaty obligations stands not only to protect children abducted to the United States, but also to protect American children abducted to other nations—whose courts, under the legal regime created by this treaty, are expected to offer reciprocal protection." *Blondin*, 189 F.3d at 242. Thus, "American courts will normally accord considerable deference to foreign adjudications as a matter of comity." *Diorinou*, 237 F.3d at 142.

But courts of the United States have declined to extend comity to foreign Hague Convention orders if they found that the foreign court's decision "'clearly misinterprets the [1980] Hague Convention, contravenes the Convention's fundamental premises or objectives, or fails to meet a minimum standard of reasonableness.'" *Smedley v. Smedley*, 772 F.3d 184, 189 (4th Cir. 2014) (quoting *Asvesta*, 580 F.3d at 1014). Analyzing the foreign court's decision before extending or declining comity is an important step. "In the

25

exercise of comity that is at the heart of the Convention (an international agreement, we recall, that is an integral part of the 'supreme Law of the Land,' U.S. Const., art. VI), we are required to place our trust in the court of the home country to issue whatever orders may be necessary to safeguard children who come before it." *Blondin*, 189 F.3d at 248-49.

Comity in a 1980 Hague Convention case typically means that a domestic court considers whether to accept the foreign court's adjudication of the child's return and the consequences of that decision. See *Diorinou*, 237 F.3d at 139; *Cook v. Arimitsu*, No. A19-1235, 2020 WL 1983223, at *4 (Minn. Ct. App. 2020) (unpublished opinion), *cert. denied* 141 S. Ct. 1514 (2021). Some appellate courts have reviewed a trial court's deference or refusal to defer to a foreign judgment de novo, as they would with questions of res judicata or collateral estoppel. See *Diorinou*, 237 F.3d at 140.

When domestic courts accept a foreign tribunal's adjudication of the 1980 Hague Convention, they first analyze the foreign court's decision under a comity analysis. In *Diorinou*, a Greek court implicitly ruled that the mother's retention of the children in Greece was not wrongful and explicitly stated that the grave risk exception in Article 13 would apply even if the retention were wrongful. 237 F.3d at 144. The *Diorinou* court not only extended comity to the Greek court's decision not to return the children, but also ruled that Greece had valid jurisdiction to decide the underlying custody dispute. 237 F.3d at 146.

In *Smedley*, the Fourth Circuit Court of Appeals extended comity to a German court's analysis of the 1980 Hague Convention even though the German court never decided the children's habitual residence. The *Smedley* court determined that the question of habitual residence was not dispositive or even helpful because an affirmative defense under Article 13 would apply anyway. The *Smedley* court also ruled that the German

26

court's factual determination from the evidence was at least minimally reasonable. 772 F.3d at 190.

Cooperation and comity both came into play in *Matter of Marriage of Long and Borrello*, 4 Wash. App. 2d 231, 421 P.3d 989 (2018). Courts in both Italy and Washington agreed that Washington was the child's habitual residence. Thus, the Italian court held that its temporary emergency orders regarding the child were effective only "until 'such time when the American court will be able to evaluate the array of elements indicated so far' and 'may make any final decision attributable to it alone.'" 4 Wash. App. 2d at 237. The *Marriage of Long and Borrello* court upheld the trial court's order to return the child to Washington and its entry of a temporary parenting plan, ruling that the trial court had jurisdiction under the UCCJEA and its order did not contravene the rule of comity. 4 Wash. App. 2d at 245.

Even where domestic courts find themselves at odds with foreign courts, they still typically engage in a comity analysis. When the *Asvesta* court reversed the lower court, it laid out the reasons that the court should not defer to the Greek courts' decisions. The *Asvesta* court specified that the Greek courts' analysis misapplied provisions of the 1980 Hague Convention, contradicted the principles and objectives of the 1980 Hague Convention, and relied on unreasonable factual findings. 580 F.3d at 1010.

In *Guimaraes v. Brann*, 562 S.W.3d 521 (Tex. Ct. App. 2018), the Texas Court of Appeals declined to extend comity to a 1980 Hague Convention judgment from a Brazilian court:

> "[A] court in the United States does not automatically lose jurisdiction to decide custody issues once a co-signer of the Hague Convention determines that the child will not be returned to the United States. Instead, the trial court here should examine the foreign court's opinion to determine whether it 'clearly misinterprets the Hague

Convention, contravenes the Convention's fundamental premises or objectives, or fails to meet a minimum standard of reasonableness.'

"Thus, even though Guimaraes's brief does not address the merits, analyze, or evaluate the propriety of the Hague Convention Order or the order affirming it, this Court will do so in reviewing the propriety of the trial court's decision not to extend comity to that order. [Citations omitted.]" 562 S.W.3d at 539 (quoting *Asvesta*, 580 F.3d at 1014).

Ultimately, the *Guimaraes* court ruled that the Brazilian court had "disregard[ed] the plain language of the Hague Convention" in applying the "well-settled" exception to Article 12, which allows the court not to return a child if the child is now settled in their new environment. 562 S.W.3d at 541 (explaining that the exception could only apply if the parent had waited more than one year before petitioning for the return of the child). And the *Guimaraes* court ruled that the Brazilian court wrongfully considered the underlying merits of the custody action, that is, the child's best interests, rather than limit itself to the merits of the abduction claim. 562 S.W.3d at 543.

In *Cook*, the Minnesota Court of Appeals ruled that the orders of a Japanese court applying the 1980 Hague Convention fell short under a comity analysis. The mother was ordered to return the children to the United States, refused to comply, and later sought to modify the return order because the father's finances had deteriorated. The *Cook* court ruled that the Japanese court wrongly rewarded the mother for her noncompliance when it modified its original order and allowed the mother to keep the children in Japan. "The Japanese orders abandoned a fundamental purpose of the Hague Convention—to ensure the *prompt* return of the children—and undermined the Hague Convention's forum-selection mechanism by allowing mother to wait for changed circumstances that were advantageous to her goal of keeping the children in Japan." *Cook*, 2020 WL 1983223, at *4.

Here, the Johnson County District Court cited *Katz v. Katz*, 986 N.Y.S.2d 611, 117 A.D.3d 1054 (N.Y. App. Div. 2014). In *Katz*, the mother took the child to the Dominican

28

Republic, and the Dominican Republic court denied the father's 1980 Hague Convention petition for return. The Dominican Republic court found that if the child were returned, "she would be exposed to a violation of her fundamental rights due to issues of domestic violence." 986 N.Y.S.2d at 612. Without analysis of comity or of the Dominican Republic court's decision, the *Katz* court asserted that it had jurisdiction over the underlying custody dispute: "A decision under the Convention is not a determination on the merits of any custody issue, but leaves custodial decisions to the courts of the country of habitual residence." 986 N.Y.S.2d at 613. It is not readily apparent why the *Katz* court did not do what the *Diorinou* and *Smedley* courts did and extend comity to the Dominican Republic court's decision. And it is not clear why the *Katz* court did not analyze comity before rejecting the foreign court's decision, as the *Asvesta*, *Guimaraes*, and *Cook* courts did. The opinion does not make clear whether the *Katz* court disregarded the Dominican Republic court's decision because it was wrongly decided, because comity was not appropriate, because of implicit judicial bias, or some other reason. This lack of analysis makes *Katz* the least persuasive of the three previously cited cases.

This requires us to analyze the Hague Court of Appeals' application of the 1980 Hague Convention. The court invoked two exceptions to permit S.L. to stay in the Netherlands, and we focus on whether the court invoked these exceptions properly. The court did not order S.L. to return to the United States (1) because there was a grave risk that her return would expose her to physical or psychological harm or otherwise place her in an intolerable situation and (2) because she objected to being returned and she has attained an age and degree of maturity at which it is appropriate to take account of her views. The Hague Court of Appeals properly applied the age and maturity exception.

"Given the fact-intensive and idiosyncratic nature of the inquiry, decisions applying the age and maturity exception are understandably disparate." *de Silva*, 481 F.3d at 1287. The courts in *Gallardo v. Orozco*, 954 F. Supp. 2d 555, 578-79 (W.D. Tex. 2013), and *Simcox v. Simcox*, 511 F.3d 594, 604 (6th Cir. 2007), refused to apply the age

and maturity exception because the child was eight years old. But in *Anderson v. Acree*, 250 F. Supp. 2d 876, 882-83 (S.D. Ohio 2002), the court applied the exception to an eight-year-old who calmly and readily answered questions, pointed to New Zealand on a globe, understood the difference between truth and a lie, and understood her obligation to tell the truth. Some courts have extended the exception to children as young as 10 and 11 years old. *Aranda v. Serna*, 911 F. Supp. 2d 601, 611-12, 614-15 (M.D. Tenn. 2013) (consulting The 1980 Hague Convention on the Civil Aspects of International Child Abduction, A Guide for Judges [Federal Judicial Center 2012]). Meanwhile, other courts have declined to extend the exception to children as old as 12 years. See *Babcock v. Babcock*, 503 F. Supp. 3d 862, 880-81 (S.D. Iowa 2020).

The exception can only apply when the child or children have expressed an objection. In *Avendano v. Smith*, 806 F. Supp. 2d 1149, 1177 (D.N.M. 2011), the court did not apply the age and maturity exception because it did not hear testimony in open court, interview the children in chambers, or receive a letter or other communication from the children. In *Velozny on behalf of R.V., N.V., and E.V. v. Velozny*, No. 20 CIV 6659 (GBD), 2021 WL 3115870 (S.D.N.Y. 2021), the children were ages 15, 12, and 4 years old. But the *Velozny* court did not apply the age and maturity exception even to the 15-year-old because the children expressed merely a preference rather than a particularized objection. 2021 WL 3115870, at *12-13.

Further, when the child objects to being returned, that objection cannot be coached or imposed on the child. In *Babcock*, the court did not apply the age and maturity exception for two major reasons. First, the child's reasons for staying in the United States had to do with his school, friends, and sports and were a more generalized preference than particular objection. Second, the *Babcock* court suspected undue influence from the father, who bought the child a dirt bike shortly before he was to return to Canada. 503 F. Supp. 3d at 881.

In *Yang v. Tsui*, No. 2:03-cv-1613, 2006 WL 2466095 (W.D. Penn. 2006) (unpublished opinion), the court quoted the Pérez-Vera Report on the age and maturity exception, but also noted a problem with courts applying the Article 13 exceptions too freely:

> "To conclude our consideration of the problems with which this paragraph deals, it would seem necessary to underline the fact that the three types of exception to the rule concerning the return of the child must be applied only so far as they go and no further. This implies above all that they are to be interpreted in a restrictive fashion if the Convention is not to become a dead letter . . . [A] systematic invocation of the said exceptions, substituting the forum chosen by the abductor for that of the child's residence, would lead to the collapse of the whole structure of the Convention by depriving it of the spirit of mutual confidence which is its inspiration." 2006 WL 2466095, at *15 (quoting Pérez-Vera Report ¶ 34, pp. 434-35).

The *Yang* court went on to say that it must be satisfied that the child's objections to return reflect "her own mature opinion and are not merely the conduit for the opinions of others." 2006 WL 2466095, at *15. The *Yang* court ultimately did not give the 10-year-old child's opinion sufficient weight to apply the age and maturity exception because of evidence of outside influence. 2006 WL 2466095, at *15.

Here, the record puts S.L. in the same category as the minor in *de Silva*. S.L. was 13 years old when she first appeared at the Arnhem-Leeuwarden Court of Appeals in November 2019, "wanting to be heard by the court without the presence of any beneficiaries." She is now 15 years old. The record leaves an ambiguity as to whether Aunt and Uncle contacted Child Protection on their own or whether S.L. prompted them to do so. The record is opaque on how the process began, and we would need to make an inference either way. But what is abundantly clear is S.L.'s consistent objections to returning to the United States with Father and Stepmother, with no evidence in the record showing her opinion is the result of undue influence.

31

The Hague Court of Appeals properly applied the age and maturity exception. S.L. fits almost precisely under the reason the Convention drafters included the exception in the first place. "'[I]t would be very difficult to accept that a child of, for example, fifteen years of age, should be returned against its will.' Elisa Pérez-Vera, *Explanatory Report: Hague Conference on Private International Law* ¶ 30, *in 3 Acts and Documents of the Fourteenth Session* 426, 433 (1980)." *Felder v. Wetzel*, 696 F.3d 92, 101 (1st Cir. 2012). In some cases, a court would have no trouble concluding that the age and maturity exception applies based on observations and evidence. See *McManus v. McManus*, 354 F. Supp. 2d 62, 71 (D. Mass. 2005). This is one of those cases. The Hague Court of Appeals' order did not clearly misinterpret the 1980 Hague Convention, contravene the Convention's fundamental premises or objectives, or fail to meet a minimum standard of reasonableness. The Hague Court of Appeals' decision is entitled to comity from us.

The Hague Court of Appeals also applied the grave risk exception. Article 13 of the 1980 Hague Convention provides that a court is not bound to order the return of the child if the person who opposes the child's return establishes that there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation. Some courts have applied this exception quite narrowly, using it to refuse to return a child to a "zone of war, famine, or disease" or in cases of "serious abuse or neglect." *Friedrich*, 78 F.3d at 1069.

The Sixth Circuit Court of Appeals stressed three factors in determining if there is a grave risk of harm to the child: (1) the serious nature of the abuse, (2) the extreme frequency with which the abuse occurs, and (3) the reasonable likelihood that the abuse will occur again absent sufficient protection. *Simcox*, 511 F.3d at 609. To review, S.L. told the Council the following: She explained that arguing was occurring in the home. S.L. stated she felt that "she must do everything to please the stepmother, that she has moved many times, that the stepmother strikes her and that she wants to stay in the Netherlands and wants peace." S.L.'s Father acknowledged her account. He stated:

"[T]he family has moved often, that there are always a lot of arguments at home, that domestic violence has taken place between the father and the stepmother, that the stepmother takes out her emotions on [S.L.] and that the stepmother [strikes S.L.] and yells at her." Also, Aunt and Uncle confirmed that there were "many problems between the father and the stepmother, that the stepmother always criticizes [S.L.] and that she does not hesitate to use physical violence."

Based on what S.L., her Father, and Aunt and Uncle told the Council, Aunt and Uncle have met their burden of showing by clear and convincing evidence that a grave risk of harm existed in this case.

*After the Dutch court refused S.L.'s return, which court had jurisdiction?*

But the crux of the dispute here is whether a Kansas court could properly exercise jurisdiction over the underlying custody case. The 1980 Hague Convention empowers courts to determine rights only under the Convention and not the merits of any underlying child custody claims. See *Babcock*, 503 F. Supp. 3d at 869.

> "This means that in cases involving the 1980 Hague Abduction Convention, a federal
> court decides only the issue as to whether the child should be returned under that
> Convention. However, should one of the defenses be established and the child not
> returned, further issues concerning jurisdiction and the substantive custody determination
> must be left to state courts." Spector, *Memorandum: Accommodating the UCCJEA and
> the 1996 Hague Convention*, 63 Okla. L. Rev. 615, 623 (2011).

Unfortunately, Professor Spector's 2011 memorandum advising how to implement a newly signed treaty into United States law was premature. In 2010, the United States signed the 1996 Hague Convention on Jurisdiction, Applicable Law, Recognition, Enforcement and Co-operation in Respect of Parental Responsibility and Measures for the Protection of Children. But the United States has yet to ratify the 1996 Hague

Convention. Thus, Professor Spector's statement that "issues concerning jurisdiction . . . must be left to state courts" accurately describes the problem before us but provides little guidance.

If the foreign court has properly invoked the exception, such that principles of comity apply, does it take jurisdiction, and how? Frustratingly, the *de Silva* court simply assumed without explaining that, after Oklahoma courts properly refused to return the child to Canada, Oklahoma courts would also take child custody jurisdiction from Canada. 481 F.3d at 1288. As Spector's article maintained, these problems must be left to the state courts. But the *Katz* court arrived at the opposite conclusion while failing to analyze how a New York state court had jurisdiction over custody of a child who would not return from the Dominican Republic. 986 N.Y.S.2d at 613. The *Katz* court did not lay out a comity analysis before declining to defer to the foreign court. Contra *Cook*, 2020 WL 1983223, at *4-5. The *Katz* court did not address the effect of the child's permanent absence on jurisdiction.

Colorado, however, has dealt with temporary absence. In *In re T.L.B.*, 272 P.3d 1148, 1152 (Colo. App. 2012), the trial court invoked the grave risk exception and refused to return the child to Canada, but only until the Canadian court could enter an order, or for a maximum of one year. The *In re T.L.B.* court rejected the mother's argument that Article 16 of the 1980 Hague Convention compelled a different result. The mother argued that the Colorado court should take jurisdiction over the underlying custody dispute, asserting that Article 16 of the 1980 Hague Convention required the court to take jurisdiction. But Article 16 is written in the negative, telling courts what not to do. Article 16 bars the judicial and administrative authorities of the abducted-to country from deciding on the merits of rights of custody "until it has been determined that the child is not to be returned" to the abducted-from country. 1980 Hague Convention, T.I.A.S. No. 11670, 1988 WL 411501, art. 16. The *In re T.L.B.* court did not interpret Article 16 as requiring the abducted-to country to decide custody in all cases in which the

child is not returned. Rather, Article 16 permitted the trial court to exercise temporary emergency jurisdiction and allow the abducted-from country, Canada, to exercise custody jurisdiction. 272 P.3d at 1155. The *In re T.L.B.* court did not need to address whether Colorado *could* take over custody jurisdiction *if* it permanently refused to return the child to Canada. That issue was outside the scope of its opinion because the Colorado court did not attempt to take permanent jurisdiction. It seems no state has yet outlined how a refusal to return a child under an exception to the 1980 Hague Convention affects the jurisdiction over the underlying custody dispute.

To answer this question, we would need to return to the text of the 1980 Hague Convention. As in *In re T.L.B.*, the relevant provision is Article 16 because it describes a properly invoked exception allowing authorities to refuse to return the child. In full, Article 16 states:

> "After receiving notice of a wrongful removal or retention of a child in the sense of Article 3, the judicial or administrative authorities of the Contracting State to which the child has been removed or in which it has been retained shall not decide on the merits of rights of custody until it has been determined that the child is not to be returned under this Convention or unless an application under this Convention is not lodged within a reasonable time following receipt of the notice." 1980 Hague Convention, T.I.A.S. No. 11670, 1988 WL 411501, art. 16.

"The clear import of treaty language controls unless 'application of the words of the treaty according to their obvious meaning effects a result inconsistent with the intent or expectations of its signatories.'" *Sumitomo Shoji America, Inc. v. Avagliano*, 457 U.S. 176, 180, 102 S. Ct. 2374, 72 L. Ed. 2d 765 (1982) (quoting *Maximov v. United States*, 373 U.S. 49, 54, 83 S. Ct. 1054, 10 L. Ed. 2d 184 [1963]); see Vienna Convention on the Law of Treaties, arts. 31-32, May 23, 1969, 1195 U.N.T.S. 331. Treaty interpretation under Articles 31-32 of the Vienna Convention on the Law of Treaties materially follows the same methods to discern meaning as statutory interpretation. Bhala & Witmer,

*Interpreting Interpretation: Textual, Contextual, and Pragmatic Interpretative Methods for International Trade Law*, 35 Conn. J. Int'l L. 58, 69, 74 (2020). Courts avoid interpreting statutes in a way which renders them meaningless, presuming that legislatures do not intend to enact meaningless legislation. *Montgomery v. Saleh*, 311 Kan. 649, 655, 466 P.3d 902 (2020). Thus, courts should avoid interpreting provisions within a treaty in a way which renders them meaningless.

To give effect to Article 16, an abducted-to contracting state must have the authority to decide on the merits of rights of custody after it has been determined that the child is not to be returned. Simply put, if the new country cannot ever take jurisdiction, then Article 16 is a nullity. The text of Article 16 has no effect and no meaning unless the abducted-to country can decide custody after properly invoking an exception to the 1980 Hague Convention. Congress has implemented the 1980 Hague Convention through ICARA. 22 U.S.C. §§ 9001 et seq. "Congress presumably does not enact useless laws." *United States v. Castleman*, 572 U.S. 157, 178, 134 S. Ct. 1405, 188 L. Ed. 2d 426 (2014) (Scalia, J., concurring). Presumably, the United States does not participate in drafting, and does not sign and ratify, useless treaties.

Our reading of Article 16 finds support in the Pérez-Vera Report:

"[T]he competent authorities of [the abducted-to state] are forbidden to adjudicate on the matter when they have been informed that the child in question has been, in terms of the Convention, wrongfully removed or retained. This prohibition will disappear when it is shown that, according to the Convention, it is not appropriate to return the child . . . . In fact, it is perfectly logical to provide that this obligation will cease as soon as it is established that the conditions for a child's return have not been met, either because the parties have come to an amicable arrangement or because it is appropriate to consider [one of] the exceptions provided for in articles 13 and 20." Pérez-Vera Report ¶ 121, p. 463.

Further, without Article 16, the 1980 Hague Convention would still lead to the same result under an analysis of habitual residence. "The place where a child is at home, at the time of removal or retention, ranks as the child's habitual residence." *Monasky*, 140 S. Ct. at 726. Father and Stepmother have argued repeatedly to the Kansas and Dutch courts that S.L.'s habitual residence was the United States when her retention occurred. But locating a child's home is a fact-driven inquiry which cannot be reduced to a predetermined formula. "Common sense suggests that some cases will be straightforward." *Monasky*, 140 S. Ct. at 727. This is not one of those cases. It has three unusual components.

First, the standing custody order from 2011 onward was the order from the Amsterdam District Court awarding custody of S.L. to Father and Stepmother jointly. Second, there was no ongoing custody battle at the time of S.L.'s retention. That is, this case does not involve the usual occurrence of one parent taking the child to a different country seeking a more sympathetic court. Finally, the date of retention is difficult to calculate, given there was a break in proceedings from December 5 to December 10, 2019, when S.L. could have returned to the United States.

The negotiation and drafting history of the 1980 Hague Convention shows that the particulars of a case dictate the child's habitual residence. The Pérez-Vera Report called habitual residence "a question of pure fact," deliberately chosen over formal legal concepts like domicile and nationality because of the flexibility the term affords. Pérez-Vera Report ¶ 66, p. 445. "The aim: to ensure that custody is adjudicated in what is presumptively the most appropriate forum—the country where the child is at home." *Monasky*, 140 S. Ct. at 727. In *de Silva*, that country was the United States because of the *de Silva* court's rightful invocation of the age and maturity exception. Here, the Hague Court of Appeals correctly decided that S.L. will not live in the United States against her will. Surely the fact that she will not return impacts the factual question of whether this country remains her habitual residence.

Critically, the Johnson County District Court did not analyze whether to extend comity to the Dutch courts, whether Father and Stepmother's 1980 Hague Convention petition was wrongly denied, or whether the Dutch courts' refusal to return S.L. would change her habitual residence. Instead, its UCCJEA analysis concluded that Kansas may not have had "home state" jurisdiction, but it had jurisdiction over S.L.'s custody under "significant connections" jurisdiction, "more appropriate forum," and "vacuum" jurisdiction.

The UCCJEA provides a prioritized listing of bases upon which child custody jurisdiction may properly be found. K.S.A. 2020 Supp. 23-37,201(a)(1) allows jurisdiction if the child lived in Kansas with a parent or person acting as a parent for six or more months before the commencement of the proceeding and the child is absent from Kansas but a parent or person acting as a parent continues living in this state. Aunt and Uncle argue that because this provision does not apply to S.L., the Johnson County District Court could not have jurisdiction. They are correct that this provision does not apply to S.L. since she went from Florida to the Netherlands and did not live in Kansas for six or more months before this proceeding. But they are wrong that the analysis ends with this home state jurisdiction. Three other bases for jurisdiction are possible, although none of them give Kansas jurisdiction in this case.

The second basis for jurisdiction is conjunctive in critical ways. A Kansas court has jurisdiction under K.S.A. 2020 Supp. 23-37,201(a)(2) if no court has home state jurisdiction *and* (A) the child *and* the parents, or the child *and* at least one parent or person acting as a parent have a significant connection with the state other than mere physical presence, *and* (B) substantial evidence is available in this state concerning the child's care, protection, training, and personal relationships. Even if no other court has home state jurisdiction, Kansas court jurisdiction will fail under both (A) and (B). First, both formulations under (A) require the child be involved. Second, whether it is one parent or both, the child must also have significant connections with Kansas. Significant

connections are also compared with the connections of the child against other potential states. See *In re Marriage of Harris*, 20 Kan. App. 2d 50, 58-60, 883 P.2d 785 (1994). S.L. had not lived in Kansas for two years, had not been enrolled in school, and had no more extended family than she had in the Netherlands. Father's parents and Aunt and Uncle lived in Groenlo, Netherlands, while Stepmother's mother lived in Overland Park, Kansas. More importantly, Kansas would also need to have substantial evidence concerning S.L.'s care, protection, training, and personal relationships. Up to this point, S.L. had been enrolled in school in Florida, presumably where her school records and friends would be. But the proceedings in the Netherlands show evidence concerning S.L., in contrast to very little evidence produced in Kansas.

Third, Kansas would have jurisdiction if all courts having home state or "significant connection" jurisdiction declined to exercise their jurisdiction on the ground that Kansas courts were the more appropriate forum to determine custody. Here, the Netherlands asserted rather than declined jurisdiction. If the Netherlands had no jurisdiction to assert, then Kansas would have vacuum jurisdiction. In either case, the "more appropriate forum" would not apply.

Finally, Kansas would have jurisdiction if no court of any other state would have jurisdiction. This vacuum jurisdiction would apply if the Hague Court of Appeals had incorrectly asserted Article 13 exceptions such that comity did not apply. If the Dutch court had misinterpreted the 1980 Hague Convention or contravened its principles, then the Netherlands could not properly exercise jurisdiction and Kansas would fill that vacuum. But in this case, the Johnson County District Court erred in determining that it had jurisdiction under the UCCJEA because it did not analyze the Hague Court of Appeals' decision under principles of comity. The Johnson County District Court could only fill the vacuum left behind after reviewing and rejecting the Dutch court's 1980 Hague Convention analysis.

39

Finally, the order which gave Stepmother custody, along with Father, over S.L. in the first place was the 2011 order from the Amsterdam District Court. But the question of whether this order provided the Netherlands with exclusive, continuing jurisdiction under K.S.A. 2020 Supp. 23-37,202 is not properly before us.

*Does the Uniform Child Abduction Prevention Act provide for the requested relief?*

Aunt and Uncle argue that the filing of an action under the UCAPA is improper. Father and Stepmother respond that they are S.L.'s parents and an "abduction" has occurred, justifying a petition under UCAPA. Because Father and Stepmother seek a remedy under UCAPA without providing any authority showing that UCAPA allows such a remedy, the Johnson County District Court erred in granting their petition. In particular, the purpose of the UCAPA is as follows:

> "The purpose of the Uniform Child Abduction Prevention Act is to deter both predecree and postdecree domestic and international child abductions by parents, persons acting on behalf of a parent or others. Family abductions are preventable through identification of risk factors and imposition of appropriate preventive measures." 2 Elrod, Kansas Law & Practice: Kansas Family Law § 13:26 (2021 ed.).

Thus, the purpose of the UCAPA is specifically to prevent abduction. Sherer, *The Maturation of International Child Abduction Law: From the Hague Convention to the Uniform Child Abduction Prevention Act*, 26 J. Am. Acad. Matrim. Law. 137, 151 (2013). Then, an order under UCAPA could, for example, require the respondent to surrender the child's passport. *Uniform Child Abduction Prevention Act (Statutory Text, Comments and Unofficial Annotations by Linda D. Elrod, Reporter)*, 41 Fam. L.Q. 23, 45 (2007). Father and Stepmother here have provided no authority that UCAPA could provide the relief they seek.

Aunt and Uncle accuse Father and Stepmother of forum shopping, saying they simply do not like the Dutch court rulings and are trying to force a different result. The cases mentioned in this opinion point to the 1980 Hague Convention as an exclusive remedy for returning a child to the country of habitual residence. Father and Stepmother do not explain how the remedies can exist side by side or how UCAPA could provide them with relief that the 1980 Hague Convention could not. They do not cite a single case to either the Johnson County District Court or to us where UCAPA was applied in the way that they request.

We reverse the decision of the Johnson County District Court, vacate the orders of the Johnson County District Court, and remand with directions to give comity to the Hague Court of Appeals.

Reversed in part, vacated in part, and remanded with directions.